UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

No. 14-2245

Danny Fischer,

Plaintiff – Appellant,

v.

Minneapolis Public Schools,

Defendant – Appellee.

---

**BRIEF OF APPELLANT**

---

Thomas E. Marshall (#155597)
Engelmeier & Umanah, P.A.
225 South Sixth Street, Suite 1230
Minneapolis, MN 55402
(612) 455-7720

ATTORNEYS FOR APPELLANT

Jonathan Paul Norrie (#347309)
Bassford & Remele, P.A.
33 South Sixth Street, Suite 3800
Minneapolis, MN 55402
(612) 333-3000

ATTORNEYS FOR APPELLEE

## SUMMARY OF THE CASE

Appellant, Danny Fischer, brought this action against Appellee, Minneapolis Public Schools ("MPS") after his recall to employment as a Janitor Engineer was rescinded. Fischer claimed that MPS regarded him as disabled because due to his failure to pass a medical examination, it considered him physically incapable of doing his former job because of his "back" and that he presented a risk of harm to himself and others.

MPS moved for summary judgment claiming the test Fischer underwent was a qualification for the position and that it did not regard Fischer as disabled despite its representations in testimony and its position statement to the Equal Employment Opportunity Commission. The trial court, the Honorable David S. Doty, granted MPS' motion. (Appellant Addendum pp. 1-13).

This appeal is before the Court pursuant to the entry of judgment below. Oral argument is necessary and Fischer requests twenty minutes of argument for each side.

# **TABLE OF CONTENTS**

**Page No.**

SUMMARY OF THE CASE                                                i

TABLE OF CONTENTS                                                 ii

TABLE OF AUTHORITIES                                             iv

JURISDICTIONAL STATEMENT                                         1

STATEMENT OF THE ISSUES ON APPEAL                                1

    1.    Whether Appellant has demonstrated a genuine issue of material precluding summary judgment on his claims of disability discrimination and reprisal. *Torgerson v. City of Rochester*, 643 F. 3d 1031, 1042 (8th Cir. 2011). ............................... 1

    2.    Whether the Trial Court considered the facts in the light most favorable to the non-moving party, Appellant, when it decided summary judgment against him. *Torgerson v. City of Rochester*, 643 F. 3d 1031, 1042 (8th Cir. 2011). .................... 1

STATEMENT OF THE CASE                                             1

    1.    Fischer's Initial MPS Employment. .................................... 2

    2.    MPS Policies. ............................................................. 3

    3.    2010 Layoff. .............................................................. 4

    4.    MPS Adopts the CRT Test. ............................................ 4

    5.    MPS Implementation of the CRT Test. ............................... 6

    6.    Fischer's Recall. ......................................................... 7

    7.    Fischer Fails the CRT Test. ........................................... 8

    8.    Fischer Tries to Get Help From MPS. ............................... 10

    9.    The CRT Form and Report. ........................................... 12

    10.    Fischer Today. .......................................................... 13

SUMMARY OF THE ARGUMENT                                          19

APPLICABLE STANDARDS OF REVIEW                                   20

ARGUMENT                                                         21

I.   GENUINE ISSUES OF MATERIAL FACT PRECLUDE
     SUMMARY JUDGMENT AGAINST FISCHER.                       21

     A.   Fischer was Regarded as Having a Disability. .......................... 22

     B.   Fischer was Qualified to do the Job. ....................................... 25

     C.   Fischer Suffered Adverse Action. ........................................... 26

     D.   MPS Violated the ADA and MHRA by Its Use of
          the CRT Test............................................................................. 26

II.  MPS ENGAGED IN REPRISAL AGAINST FISCHER.              32

III. THE TRIAL COURT DID NOT FOLLOW ACCEPTED
     STANDARDS IN GRANTING SUMMARY JUDGMENT TO
     MPS.                                                      33

CONCLUSION                                                    39

CERTIFICATE OF COMPLIANCE                                     40

# TABLE OF AUTHORITIES

**Page No.**

## Cases

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ..................................... 26

*Arcoren v. United States*, 929 F.2d 1235, 1239 (8th Cir.1991) ............................. 43

*Canny v. Dr. Pepper/Seven-Up Bottling Group, Inc.*, 439 F.3d 894, 901-02 (8th Cir. 2006) ...................................................................... 29

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) .............................................. 26

*Chevron U.S.A., Inc. v. Echazabal*, 536 U.S. 73, 86 (2002) ................................. 36

*Clark v. Heidrick*, 150 F.3d 912, 915 (8th Cir.1998)............................................. 43

*Clegg v. Ark. Dep't of Corr.*, 496 F.3d 922, 926 (8th Cir. 2007) ......................... 32

*Cravens v. Blue Cross & Blue Shield of Kansas City*, 214 F.3d 1011, 1016 (8th Cir. 2000)................................................................. 31

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589–90 (1993) ................... 43

*Dovenmuehler v. St. Cloud Hosp.*, 509 F.3d 435, 439 n. 4 (8th Cir. 2007)........................................................................................ 27

*EEOC v. Hibbing Taconite Co.*, 720 F. Supp. 2d 1073, 1080 (D. Minn. 2010).......................................................................... 29, 36, 37

*EEOC v. Houston Area Sheet Metal Joint Apprenticeship Comm.*, No. Civ. A.H.-00-3309, 2002 WL 1263893, at *8 (S.D. Tex. May 31, 2002) ......................................................................... 29

*EEOC v. Wal-Mart Stores, Inc.*, 477 F.3d 561, 571 (8th Cir. 2007) ..................... 35

*Eldredge*, 809 F.Supp. 2d at 1033 .............................................................. 36, 37

*Finan v. Good Earth Tools, Inc.*, 565 F.3d 1076, 1079 (8th Cir. 2009) ................ 27

*Fuqua v. Unisys Corporation*, 716 F. Supp.1201 (D. Minn. 1989)........................ 40

*Garcia-Ayala v. Lederly Parenterals, Inc.*, 212 F.3d 638 (1st Cir. 2000) ........................................................................................ 37

*General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) .......................................... 43

*Heise v. Genuine Auto Parts, Co.*, 900 F. Supp. 1137 (D. Minn. 1995)................. 37

*Heisler v. Metro. Council*, 339 F.3d 622, 632 n. 6 (8th Cir. 2003)........................ 38

*Huisenga v. Opus Corporation*, 494 N.W.2d 469, 474 (Minn. 1992) .................... 33

*Jenkins v. Medical Laboratories of Eastern Iowa*, 880 F.Supp. 2d 946 (N.D. Iowa 2012) ............................................................................... 40

*LaMott v. Apple Valley Health Care Center, Inc.*, 465 N.W.2d 585, 589 (Minn. App. 1991)............................................................................ 31

*Maschka v. Genuine Parts Company*, 122 F.3d 566 (8th Cir. 1997)...................... 41

*Mems v. St. Paul Dep't of Fire & Safety Servs.*, 224 F.3d 735, 738
    (8th Cir. 2000)..................................................................................26
*Rehrs v. Iams Co.*, 486 F.3d 353, 356 (8th Cir. 2007)............................31
*Ricci v. DeStefano*, 129 S.Ct. 2658, 2677, (2009) ...............................26
*Scott v. Harris*, 550 U.S. 372, 380, (2007)...........................................26
*Sprague v. United Airlines, Inc.*, No. Civ. A. 97-12102, 2002
    WL 1803733, at *12 (D. Mass. Aug. 7, 2002) ..............................29
*State by Khalifa v. Hennepin County*, 420 N.W.2d 634, 640
    (Minn. App. 1988).........................................................................31
*Stewart v. Indep. Sch. Dist. No. 196*, 481 F.3d 1034, 1043
    (8th Cir. 2007) ..............................................................................38
*Torgerson v. City of Rochester*, 643 F. 3d 1031, 1042
    (8th Cir. 2011).................................................................i, 7, 26, 39

## Statutes

Minn. Stat. § 363A.01 ..............................................................................6
Minn. Stat. § 363A.03, Subd. 12 .............................................................28
Minn. Stat. § 363A.03, Subd. 36 .............................................................38
Minn. Stat. § 363A.08, subd. 2................................................................27
Minn. Stat. § 363A.08, Subd. 6(b)(5)......................................................38
Minn. Stat. § 363A.15 ..............................................................................38
Minn. Stat. § 363A.20, Subd. 8 ...............................................................33
Minn. Stat. § 363A.25 ..............................................................................35

## Other Authorities

8 FEP Manual 405:7197 (1995)      32, 34
EEOC Enforcement Guidance: Disability-Related Inquiries and
    Medical Examinations of Employees Under the Americans with
    Disabilities Act      32
EEOC Enforcement Guidance: Pre-employment Disability-Related
    Questions and Medical Examinations      32, 34
EEOC Technical Assistance Manual      32, 34, 35

## Rules

F.R.Civ.P. 56(a)......................................................................................26

## Regulations

29 CFR § 1630.1(c)(4) ........................................................................28
29 CFR § 1630.13(a) ..........................................................................32
29 CFR § 1630.14 ..........................................................................34, 35
29 CFR § 1630.2(j)(2) .........................................................................28
29 CFR § 1630.2(m) ............................................................................31
29 CFR § 1630.2(r) .............................................................................36
29 CFR § 1630.4(a) .............................................................................27
42 USC § 12101 ...................................................................................6
42 USC § 12102(1) ..............................................................................28
42 USC § 12102(a)(3)(B) .....................................................................28
42 USC § 12112(a) ..............................................................................27
42 USC § 12203(a) ..............................................................................38

vi

## JURISDICTIONAL STATEMENT

Fischer alleges disability discrimination in violation of the Americans with Disabilities Act ("ADA"), 42 USC § 12101, et seq., for which the District Court had original jurisdiction under 28 USC § 1331. Fischer also asserted claims pursuant to the Minnesota Human Rights Act ("MHRA"), Minn. Stat. § 363A.01, et seq.

This Court has appellate jurisdiction pursuant to Fischer's timely notice of appeal on May 28, 2014, following the entry of judgment on April 29, 2014.

## STATEMENT OF THE ISSUES ON APPEAL

1.  Whether Appellant has demonstrated a genuine issue of material precluding summary judgment on his claims of disability discrimination and reprisal. *Torgerson v. City of Rochester*, 643 F. 3d 1031, 1042 (8th Cir. 2011).

2.  Whether the Trial Court considered the facts in the light most favorable to the non-moving party, Appellant, when it decided summary judgment against him. *Torgerson v. City of Rochester*, 643 F. 3d 1031, 1042 (8th Cir. 2011).

## STATEMENT OF THE CASE

Like his mother and great-grandfather before him, Appellant, Danny Fischer, obtained work as a Janitor Engineer at Appellee, Minneapolis Public Schools ("MPS"). After working two years without incident, Fischer was laid off. When

1

recalled from layoff, MPS considered him disabled and unjustly refused to return him to his position, despite his protests that an error in a test obviously occurred. Fischer sought restoration of his seniority and reinstatement to his former position.

Following discovery, MPS moved for and was granted summary judgment by the trial court. (Appellant Addendum pp. 1-13). Fischer presented facts, including many which were uncontested, which demonstrated material issues for trial. The trial court chose to ignore several important facts, discount MPS' admissions, and determine a credibility issue against Fischer in finding against him. Fischer appeals that improper ruling.

1.    Fischer's Initial MPS Employment.

Fischer, following his high school graduation, secured employment as a Janitor Engineer at MPS in March 2008 (AA 16, 20, 40)[1]. He obtained his Boiler's license while working which completed his qualification for the position. (AA 21, 41, 95). His mother worked for MPS as a Maintenance Engineer for 33 years. (AA 58-9). Fischer's great-grandfather also worked for MPS. (AA 60, 74).

Fischer performed well and when he was recalled from layoff in 2011, his former supervisor told Fischer's mother he looked forward to Fischer's return to work. (AA 74, 96-7, 115-6). During his MPS service, Fischer was in good health, suffered no work related injuries, lost no time from work for illness, and had no

---

[1] Record citations are to the pages in Appellant's Appendix ("AA").

difficulty performing his duties. (AA 62, 72, 115-6). In fact, his overall health improved as he lost approximately 50 pounds of weight while working at MPS and kept it off. (AA 306, 310). Fischer has never had a medical disability or impairment and is not physically disabled in any way. (AA 33).

2.     MPS Policies.

Fischer, as an employee, belonged to a union and, according to the collective bargaining agreement, the rules of the Minneapolis Civil Service Commission apply to his employment relationship with MPS. (AA 22, 93, 110). These rules state "[a]ny employee…who has been laid off may be re-employed without examination in a vacant position of the same class within three years of the layoff." (AA 93, 97-8, 119, 286). MPS administrative management staff responsible for implementation were unfamiliar with this rule. (AA 137, 197). The only direction provided to Human Resources about this rule as far as qualifications, at least for Janitor Engineers like Fischer, was that they have their Boiler's license and "be able to perform the essential functions of the job with or without an accommodation." (AA 287).

MPS has an Equal Opportunity Policy prohibiting unlawful discrimination and to make accommodation for qualified disabled employees. (AA 94, 111-2, 136-7, 171, 192). It also has a disability non-discrimination policy which prohibits the school district from engaging "in contractual or other arrangements that have the

3

effect of subjecting its qualified applicants or employees with disabilities to discrimination on the basis of disability." (AA 94, 113-4).

3. 2010 Layoff.

In June 2010, MPS laid off Fischer and many of his co-workers. (AA 23, 45, 51-3, 60, 83, 97). Fischer then obtained employment similar to that performed at MPS. (AA 19, 24, 60). He passed a strenuous physical examination for that employment in September 2010. (AA 61).

4. MPS Adopts the CRT Test.

Other than some pre-employment physicals done in the 1990s, MPS did no hiring examinations for Janitor Engineers prior to 2011. (AA 95, 130, 193). MPS Risk Management Director Lisa Strombeck heard that two other large school districts were doing some type of preplacement exam and MPS had recently had a couple of large workers' compensation claims. (AA 134). MPS decided to begin use of a CRT test for several positions, including Janitor Engineers, Food Service Workers, and Special Education Assistants, with the cutoff being a 50 pound lifting requirement. (AA 93, 98, 133). Despite this decision, Strombeck did not feel MPS was hiring people that were prone to injury and other managers were unaware of any particular concern of persons being injured on the job or any experience that would lead to the need for a CRT test. (AA 134, 193). MPS' Employee Relations Director did not know why MPS considered using the CRT test. (AA 289).

4

MPS received promotional materials and presentations regarding the CRT test. (AA 135, 243-81). Strombeck intended that this CRT test occur *after* the person was hired, even though CRT marketed itself as a "pre-offer" test. (AA 135, 138, 144, 195-6, 198-200). MPS' Director of Strategic Workforce Management, Greg Bendel, had no idea why MPS decided to implement the CRT as a post-offer test. (AA 188, 200). Strombeck testified she had no knowledge that CRT recommended its test be used pre-offer, not post-offer. (AA 143-4, 175). CRT's literature advised that medical information, such as pulse and blood pressure, would convert the test to a medical exam, and such information should not be collected pre-offer. (AA 144, 176-7). MPS knew that a medical questionnaire was included with the CRT test. (AA 142). Bendel was unaware such questions were being asked on the form that was ultimately provided to Fischer. (AA 201).

The MPS Risk Management department had no input into the creation of job descriptions. (AA 132). Strombeck hired the CRT provider to review essential functions once they had been established and perform an analysis of the positions. (AA 132, 154-9, 212-27). The contract for use of the CRT was approved by MPS in April 2011. (AA 136, 167, 206-10). Under the contract, the CRT provider "is not responsible for 'false positives' or other incorrect screening results, or otherwise in respect of services provided …." (AA 206-7). MPS had to ensure compliance

5

with the law and even "indemnify, defend and hold [the CRT provider] harmless...indefinitely." (AA 207).

The program was ultimately implemented in the summer of 2011. (AA 137). MPS made the decision it would only apply to new hires. (AA 137). MPS did not discuss using it for recalled employees but deliberately chose not to use it for existing employees, including those who were returning from medical leave, even though Strombeck had proposed doing the CRT test on all employees. (AA 98, 138). CRT tests were not used to evaluate persons returning from workers' compensation injuries as well. (AA 181). Strombeck was not familiar with recall procedures and did not know if recalled employees were to be considered new hires. (AA 138).

MPS also made the decision when it implemented the program not to allow retests. (AA 139). The Director of Employee Relations gave no direction as to how staff members in Human Resources were to deal with issues if someone failed a CRT test. (AA 288).

5.    MPS Implementation of the CRT Test.

MPS intended to track the use of the CRT to determine its effectiveness, especially with regard to special education assistants, but is unsure if it continued doing so. (AA 184, 200, 282). Once it began using the CRT test, MPS experienced a failure rate of 20% for special education assistants, a rate so high MPS finally

stopped using the test altogether for that position. (AA 107, 194, 197-8, 200). However, before MPS stopped using the test for that position, it allowed retests for special education employees who failed. (AA 104, 106-7, 202, 204). When Fischer failed his test, he was not offered a retest. (AA 202).

6.    Fischer's Recall.

Over time, MPS began recalling employees who were laid off with Fischer. However, not all of them were required to take the CRT test. (AA 70, 102-3, 204)[2]. Mary Alfredson, MPS Human Resources Consultant, had the responsibility to deal with these recalled Janitor Engineers. (AA 91-2, 195).

On December 8, 2011, Alfredson recalled Fischer from layoff and directed him to do a CRT assessment at a physician's office in St. Paul. (AA 24, 46, 62, 98). Alfredson had received "minimal" instruction on the CRT forms and had no understanding of the CRT test itself. (AA 99). MPS recalled Fischer, like the other Janitor Engineers, based on his seniority and he was excited to return to work at MPS. (AA 24, 286). According to Alfredson, the recall could not go forward unless he had his licensing and CRT test in place. (AA 101). She did not consider there to be an actual offer of employment to Fischer until after Fischer appeared

---

[2] The document listing the recalled co-workers (Alfredson Deposition Exhibit 6), some of whom were required to take the CRT test and others who were not, was filed under seal and is not included in Appellant's Appendix. It can be found in the trial court's record as Court File 12-cv-2432 [DOC 35, Exhibit E].

Appellate Case: 14-2245    Page: 14    Date Filed: 07/24/2014 Entry ID: 4178967

with his Boiler's license and completed the CRT test. (AA 102). Alfredson knew Fischer had performed the job for two years when she sent the recall notice. (AA 105). She made no inquiry of Fischer as to what job he was working when recalled. (AA 105). She later made no inquiry into the reason he may have failed the test. (AA 105).

Fischer proceeded to the test location for the CRT assessment. While he received a form stating he was to use "maximum effort," he did not really know how much effort to give as the machine had no resistance and he had never been on the machine before. (AA 26, 48). No one explained the forms to Fischer. (AA 38). He completed a health history, his blood pressure and pulse were taken, and he proceeded to the test. (AA 25, 49). Alfredson, when doing interviews of other applicants, knew such medical questions were improper. (AA 101). Fischer thought the test was quite easy and had no doubt that he passed. (AA 62-3, 84-5). There was an arm, a leg, and a torso component. (AA 26). The whole appointment only took a few minutes. (AA 25).

7.     Fischer Fails the CRT Test.

Fischer was rated with a Body Index Score (BIS) of 197.5 according to the CRT test results. (AA 50, 100). CRT rated the Janitor Engineer position as requiring a 201 BIS minimum score as it classified it as a "medium-heavy" position. This BIS score is a creation of CRT to mathematically relate its results to

8

department of labor classifications. (See AA 172-3). The report was faxed to MPS by CRT within 24 hours of the test. (AA 99, 135). Alfredson wrote "did not pass" on the form. (AA 101). Alfredson had no discretion and mechanically applied the range to the test result. (AA 102). The test results pulled Fischer out of the running for the Janitor Engineer position and Alfredson moved to the next person on the seniority list. ((AA 102, 141). Fischer lost his seniority since he was no longer eligible for recall because he failed the CRT test. (AA 290). Fischer left messages for Alfredson as he heard nothing. (AA 27). Alfredson then left him a message that he had failed the test on December 18. (AA 27-8, 63, 102). When asked, "[d]id you have the understanding…that having that score of 197.5 made him incapable of pulling, carrying, pushing or lifting a heavy load," Alfredson answered "[y]es." (AA 105). She held that belief when she first received the results of Fischer's CRT test. (AA 106). MPS maintained this understanding and belief when it wrote its position statement to the EEOC months later. (AA 123). MPS wrote that his "job performance would potentially endanger not only other employees but himself." (AA 123). Employee Relations Director Mason agreed that MPS considered Fischer incapable of doing his job due to his physical condition because he failed the CRT test. (AA 292). As MPS wrote in its position statement, Fischer was "not physically capable of performing the essential functions" of a Janitor Engineer. (AA 123). It added:

> Mr. Fischer's BIS of 197.5 indicates his job performance would potentially endanger not only other employees but himself when being required to pull, or carry, or push, or lift a heavy load. Thus, he being incapable of pulling, carrying, pushing, or lifting a heavy load, creates a substantial risk of injury in the workplace.

*Id.*

The only reason Fischer was not allowed to return to work was because of his CRT test result. (AA 290). MPS was unaware of any specific injury that would befall Fischer had he returned to work or any other employees which needed protection from him. (AA 143). While Bendel could not articulate any specific injury that a person would be at risk of sustaining and did not see Fischer as presenting a significant risk of injury to himself or others, since he failed the CRT test, MPS considered Fischer not physically qualified to do the job. (AA 199, 202). Fischer would be considered to "stand a higher risk of injury than someone who was able to pass it." (AA 199). Fischer had no idea why he failed the test. (AA 183).

8.    Fischer Tries to Get Help From MPS.

Fischer, his mother, and his grandfather spoke to several persons at his union and MPS. (AA 28-32, 57, 64-7, 85, 87). Fischer and his mother were directed to Risk Management as that department dealt with physical problems. (AA 29-30, 75). Strombeck told him that he "didn't pass" and was "bypassed on the list" because of his "back." (AA 30, 36). Fischer's mother asked Strombeck and

10

Bendel, "does he look like a 23 year old with a back injury?" (AA 65, 72-3). They responded, "no it doesn't look like he has any back issues." (AA 73). Yet, Fischer was told he had a problem with his back. (AA 37). Strombeck had no knowledge of Fischer or his MPS work performance from 2008-2010. (AA 127, 137). Fischer told Bendel he was in "great shape" and could not understand how he could have failed the test. (AA 201-2). Bendel agreed but he would not let Fischer retake the test. (AA 31, 202).

Strombeck engaged in no interactive process with Fischer despite considering the CRT test a post-offer examination. (AA 141). Bendel told Strombeck he was surprised Fischer did not pass the test and felt bad he didn't pass. (AA 140). They had discussed retakes in the past but decided to stick with the guideline and not permit a retake for Fischer. (AA 140-1). Alfredson also talked to Strombeck about retesting someone if they did not pass. (AA 103). When asked by Fischer's mother if Fischer could retake the test, Strombeck said no. (AA 58-9, 141). She said he could take it if he reapplied as a new applicant despite his loss of seniority. (AA 142). Strombeck testified the policy against retakes would be applied in all situations, with no discretion to depart from it. (AA 142).

Heather Berggren, an MPS Total Compensation Assistant, reported to Director Strombeck. (AA 179-80). Berggren would work with accommodating persons who presented with restrictions. (AA 180). Fischer and his mother spoke

Appellate Case: 14-2245    Page: 18    Date Filed: 07/24/2014 Entry ID: 4178967

with Berggren about the failure of the CRT test because Strombeck was not available the day they came in. (AA 64, 182). They raised that it was not fair to Fischer not to return when other Janitor Engineers who were not physically able to do the job were not required to do the CRT test. (AA 19, 182). Berggren observed no apparent physical problems of Fischer. (AA 182). No one had any follow up with Fischer. (AA 183).

A representative of CRT ultimately told Fischer his specific back score. (AA 31-2). Up to that point no one had explained how he failed. (AA 32). The CRT representative told him he passed the arm and leg test and that his back score was "126 or a 127 out of 140." (AA 32). He explained that the back score was not bad "but it it's up to the company if they want to re-hire you or not." (AA 32). Fischer was told by Directors Strombeck and Bendel that he was at risk of a disability if he continued to work there. (AA 36, 85).

9.    The CRT Form and Report.

The CRT result form and data sheet incorrectly show Fischer as applying as a "teacher" rather than a Janitor Engineer. (AA 50, 100, 140, 174). In addition, the data sheet describes Fischer as *weighing 69 pounds and being only 15 inches tall*!

(AA 140, 174, 203).[3]  According to MPS, as long as CRT said a test was valid, no retest would be done, even if mistakes appeared apparent.  (AA 144).

Strombeck was unaware if Fischer was unqualified for the job and made no inquiry to Fischer as to whether he could safely do the job, or what kind of work he did while on layoff, or asked Fischer's former supervisors about his work performance at the school district.  (AA 142).  The Director of Employee Relations testified that MPS had the obligation to look into the issue further but had no awareness such inquiry was done for Fischer.  (AA 292).

10.    Fischer Today.

Presently, Fischer works for another school district in a part-time position equivalent to a Janitor Engineer and has held that position since February 2013. (AA 18, 87-8).  He also works for another business performing similar work, as he tries to maintain full time wages.  (AA 17-8, 70).

In order to refute MPS's allegations and demonstrate his ability to perform the work he had performed for two years, Fischer was examined by Thomas C. Jetzer, MD MPH.  Dr. Jetzer has superb qualifications in occupational medicine. (AA 294-303).  He has many years of experience and has conducted thousands of fitness examinations for private and public employers and federal agencies.  *Id.*  He is also recognized for his development and participation in standards to assess

---

[3] Fischer weighs 151 pounds and is 68 inches tall. (AA 307).

Appellate Case: 14-2245    Page: 20    Date Filed: 07/24/2014 Entry ID: 4178967

employees, as discussed in his invitation to sit on ANSI panels and act as Medical Director for various corporations. He taught ergonomics for the Minnesota School of Public Health for seven years. Accordingly, he was quite well qualified to assess Fischer's medical status, the ability to do the work, and the means and methods employed by MPS to prevent Fischer from returning to work.

Dr. Jetzer offered the following opinions:

1.    In December 2011 was Danny Fischer physically capable of performing the position as janitor/engineer at the Minneapolis Public Schools?

> I find no evidence to the contrary that he was not. He had been performing the job in the past and he had done so in the course of 2008 to 2010, without difficulty, and performed similar work at Mystic Lake after that. He actually is in better shape at this time, being 50 pounds lighter than when he started, which he has maintained, and, in my opinion, would have been in the position to perform the essential duties of that job, without a need for accommodation.

2.    At the present time, is Danny Fischer physically capable of performing the position as the janitor/engineer at the Minneapolis Public Schools?

> Yes. My clinical examination indicates that he has no basis for restrictions of physical activity and has the strength and endurance and is medically qualified to perform the essential functions of the job as a janitor, as I reviewed the job description provided to me.

3.    Is Mr. Danny Fischer physically incapable of performing the essential tasks of the janitor for the Minneapolis Public Schools?

> No. He is quite capable, in my opinion, based on my review of the medical records, history, general habitus and examination. His medical history and work history also supports the ability to do this type of work, as he has done

14

it before not only there, but for other employers of a similar nature. There is nothing in the medical records showing any inability, physically or mentally, that would prohibit his ability to perform the essential functions as a janitor/engineer as described by the Minneapolis Public Schools.

4.     Does Danny Fischer represent a significant risk or potential harm to himself or others on performing the position as a janitor/engineer at the Minneapolis Public Schools?

No.  He is a physically fit 24-year-old young male.  He does not represent any physical incapability that poses a risk to himself or others in doing the job as a janitor/engineer.

5.     In your opinion, did Minneapolis Public Schools regard Mr. Fischer substantially impaired in the ability to perform his major life activities of pulling, carrying, pushing and lifting?

Yes.  By claiming that he did not pass the test, which they have used as a measure of requirements of doing the janitor/engineering job, they have disqualified him and considered him impaired and at risk of doing this type of work.

6.     In your opinion, did Minneapolis Public Schools regard Mr. Fischer as posing a direct threat to the health or safety of himself and others in the work place?

Certainly it is my opinion that he was capable of doing the job; there was no threat to himself or others and he had the physical capacity to do the job. There is no basis to establish this CRT test has any bearing on the risk to others.

7.     In your opinion, did the Minneapolis Public Schools apply accepted assessment mechanisms utilized in this community to determine the physical capability of an applicant or recalled employee to perform a particular job?

Appellate Case: 14-2245     Page: 22     Date Filed: 07/24/2014 Entry ID: 4178967

No, I do not believe they did. In this case, they used a simple test of measuring body strength in three different parameters, which is not a specific simulation of the job which would test whether he really could do the tasks themselves. They categorized the job as a medium to heavy job and, based on the discrepancies which appear to have been done in error, based on the records you provided me, i.e., wrong weight, height and job description, they determined he was not capable of doing the job.

To establish one's capability of doing the job, testing should be job specific, i.e., measuring the specific capabilities and tasks that would be required and not a generalization of various body motions which may not be specific to the job itself, which is what CRT does. In contrast to other specific activities and contrast in terms of community and even public schools, often when people are questioned whether they can do a job, there is a formal function capacity which is done that often simulates the job.

I am aware of two other entities in the Minneapolis government which does job specific testing. One which I have taken myself is a fire school for the Minneapolis Fire Department, which has a very realistic simulation of the job to test fitness of an individual, i.e., putting out a fire with a hose with a suit on in a hot room, carrying hoses up stairs, chopping a hole in the roof and carrying a 185-pound dummy. This clearly tests strength and capability, rather than a machine which gives one-time measurement of motion and muscle strength, without training or specific analysis of how to do the job, which appears how this testing was done.

Another specific test that Minneapolis has set up with heavier work, in terms of outdoor maintenance with handling of heavy bags, moving them and shoveling sand, is done for specific simulation of the job to determine one's fitness to do the job in a needed time. Again, the example is that the job itself is simulated and not generalized, as in the CRT. There are other jobs and employers which I am involved with who do specific testing, in terms of the specific requirements of lifting. Another example is a flight simulator for pilots. Pilots can be tested with exact simulation of the job with a flight simulator. This is appropriate to determine if the pilot is ready for flight duties or has some type of impairment. Again, it is an exact simulation of the job and not some generic test.

This is the basic flaw in which the Minneapolis Public Schools applied this type of physical test, in my opinion, with the CRT test.

Appellate Case: 14-2245    Page: 23    Date Filed: 07/24/2014 Entry ID: 4178967

8.      In your opinion, do you consider the CRT assessment, as performed on Mr. Fischer, a medical assessment as opposed to a "strength and agility test" considering the inquiry into his medical history, the recording of medical information such as pulse and blood pressure, and the measurement of physical data?

> They were measuring his body with vital signs, blood pressure, pulse, height and weight, and his ability to move and function in the medical office. In my opinion, that constitutes a medical examination as that is what I do every day. I do not appreciate the difference, because they had a machine involved in this rather than having him bend, lift or push, that this is anything but as on a physical examination. This gives them a very limited amount of nonspecific information, unfortunately.

9.      What is your observation and opinion regarding the effectiveness of generic testing like CRT for pre-employment placement issues?

> There are a number of problems, as alluded to above. These are not job specific tests in measuring one's ability to do the job.
>
> Secondly, another flaw, particularly in this case, is that they have not measured the other employees who are doing the work, i.e., there appears to be over 200 employees doing the same work that Mr. Fischer was applying for who have never been tested and may fail this test, but yet still are demonstrating their ongoing ability to do the job. Certainly, there is no specific verification that I have seen that states there is an acceptable validation assessment which demonstrates the job that Mr. Fischer was applying to do is representative of the type of testing that was performed by the CRT, or that the testing was any validation of capability assessment.
>
> A further problem in this test is that measuring muscle strength, as this CRT does, is only one parameter of risk. An individual of somewhat large size may have the ability to perform this well one day which would be just a snapshot of the capability.

17

On the other hand, this test may discriminate someone who does not understand the test and does not fully understand how to perform it without knowledge or practice. It also ignores the possibility that an individual may have significant risk because of structural damage or abnormalities such as Scheuermann disease or previous herniated disc, which would put the person at substantially more risk than just muscle weakness, i.e., someone could have a herniated disc and pass this test, go on to perform the job, and very quickly develop progression of a herniated disc, requiring surgery and decompression. This is not measured by this test and could only be measured by imaging. It also does not take into account the applicant's previous history, i.e., work performance, and performance on the specific job itself. All of these matters go against the use of these generic tests as a stand-alone test for job capability and functionality as they are screened to.

In my opinion, they are not in any way a measure of the future risk or capability. Furthermore, they can discriminate against someone who simply did not understand the test and is not given the opportunity to retest. Even with hearing tests in occupational health, when someone has a hearing test that is somewhat abnormal, we always perform a retest to see if there are other confounding factors, such as a cold, inability to understand the test, etc.

Therefore, it is my opinion that the CRT test, while it may be a measure of some one-time muscle strength, in no way gives any indication of one's capability to do a job. There is no indication that if the person is deemed to be unacceptable that there has been any consideration for accommodation, i.e., if there is a safer and smarter way to do the job; or, if one fails the test, if one is allowed to condition him/herself and retest. Also, if there any warning that this test will be given, i.e., one needs to be able to have specific strength, so applicants could be able to measure and prepare for the test.

The reasons that these tests are not often used are the reasons as noted above and, in my opinion, are inappropriately applied in this case with the Minneapolis Public Schools. It appears that they have also had problems with trying to apply this to Special Education Assistants, as 20 percent fail. I do not understand how this test can be applied to someone who may be required to confine or control an unruly child and how this test can summarize to give an approximation of that type of activity. As well, it cannot be used to define the requirements or capabilities of an eclectic job such as a janitor/engineer.

( AA 310-14).

Prior to offering these opinions, Dr. Jetzer examined Fischer, received the documentation on the CRT test produced by MPS and also those identified in the depositions, reviewed the deposition of Fischer, his mother, Alfredson, the person who handled Fisher's recall, and Strombeck, the architect of the adoption of the CRT test by MPS. (AA 294, 305-9).

## SUMMARY OF THE ARGUMENT

Fischer seeks reversal of the trial Court's summary judgment decision. Fischer demonstrated genuine material facts to permit his regarded as disability discrimination claims and reprisal claims to go to the jury. These facts include: Fischer's prior work as a Janitor Engineer for MPS; his excellent health and physical condition; the history of the CRT test adoption by MPS; the inconsistent application of the CRT test between employees of the same classification and different classifications; the failure of the CRT test; the allowance of retests for some employees and not others; expert opinion that the CRT test does not properly assess the qualifications for a Janitor Engineer; the inconsistent use of the CRT test as a pre-offer medical examination as well as a post-offer test; the blatant mistakes on Fischer's actual CRT test; the admissions of Alfredson and others that Fischer was physically incapable of performing the job and presented a risk of harm; MPS' position statement to the EEOC stating Fischer's physical incapability and

Appellate Case: 14-2245    Page: 26    Date Filed: 07/24/2014 Entry ID: 4178967

presenting a risk of harm, and; Fischer's and his family's attempts to resolve or have him retested.

The Trial Court ignored many of these multiple material facts, including the facts from the CRT test itself. The Trial Court improperly made a credibility determination that MPS personnel did not make comments which Fischer and his family specifically testified about regarding Fischer's "back." The Trial Court did not apply the facts in the light most favorable to the non-moving party, Fischer, as required by the standards for summary judgment. The Trial Court should have denied summary judgment and allowed Fischer his right to air his claims in open court to a jury.

## APPLICABLE STANDARDS OF REVIEW

This Court reviews a grant of summary judgment *de novo*. *Torgerson v. City of Rochester*, 643 F. 3d 1031, 1042 (8th Cir. 2011). Summary judgment may occur when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. F.R.Civ.P. 56(a). The moving party bears the burden of showing that the material facts in the case are undisputed. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Mems v. St. Paul Dep't of Fire & Safety Servs.*, 224 F.3d 735, 738 (8th Cir. 2000).

"On a motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those

Appellate Case: 14-2245    Page: 27    Date Filed: 07/24/2014 Entry ID: 4178967

facts.' " *Torgerson,* 643 F. 3d at 1042, *citing Ricci v. DeStefano,* 129 S.Ct. 2658, 2677, (2009) *quoting Scott v. Harris,* 550 U.S. 372, 380, (2007). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id., citing Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, (2000), *quoting Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).

Here, MPS discriminated against Mr. Fischer in violation of state and federal law, and retaliated against him when he sought assistance. MPS' Motion for Summary Judgment should be denied and Mr. Fischer permitted to proceed to trial.

## ARGUMENT

## I. GENUINE ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT AGAINST FISCHER.

The Americans with Disabilities Act (ADA) and the Minnesota Human Rights Act (MHRA) prohibit an employer from taking an adverse action against an employee because of the employee's disability. 42 USC § 12112(a); Minn. Stat. § 363A.08, subd. 2. It is unlawful to discriminate on recruitment and job application procedures, hiring, right of return from layoff, and rehiring. 29 CFR § 1630.4(a)(i) and (ii). Fischer's claims under both the ADA and MHRA are analyzed under the *McDonnell Douglas* burden shifting analysis. *Dovenmuehler v. St. Cloud Hosp.,* 509 F.3d 435, 439 n. 4 (8th Cir. 2007). To establish a prima facie case of disability discrimination under this framework, Mr. Fischer must show that:

21

(1) he had a disability within the meaning of the ADA and the MHRA; (2) he was qualified to perform the essential functions of his job, with or without reasonable accommodation, and (3) he suffered an adverse employment action because of his disability. *Finan v. Good Earth Tools, Inc.*, 565 F.3d 1076, 1079 (8th Cir. 2009).

### A.    Fischer was Regarded as Having a Disability.

Fischer, by his perceived physical impairment to his back precluding him from working, lifting and performing manual tasks, has a "disability" as that term is defined by 42 USC § 12102(1) and Minn. Stat. § 363A.03, Subd. 12. Effective January 1, 2009, with the ADA Amendments Act (ADAAA), Congress broadened the definition of "regarded as" or perceived disability. The primary purpose of the ADAAA "is to make it easier for people with disabilities to obtain broad protection under the ADA." 29 CFR § 1630.1(c)(4). The definition of "disability" "shall be construed broadly in favor of expansive coverage." *Id.* "The primary object of attention…should be whether covered entities have complied with their obligations and whether discrimination occurred, not whether the individual meets the definition of disability." *Id.*

An employer is liable under a "regarded as" theory if individuals can prove discrimination because of an actual or perceived physical or mental impairment, whether or not the impairment actually limits or is perceived to limit a major life

Appellate Case: 14-2245   Page: 29   Date Filed: 07/24/2014  Entry ID: 4178967

activity. 42 USC § 12102(a)(3)(B). Whether an individual's impairment "substantially limits" a major life activity is not relevant. 29 CFR § 1630.2(j)(2).

Fischer met the qualifications of the Janitor Engineer position for over two years without incident, worked in such a position when laid off, and continues in a similar position today. *See Canny v. Dr. Pepper/Seven-Up Bottling Group, Inc.*, 439 F.3d 894, 901-02 (8th Cir. 2006) (holding that evidence that the Appellant had successfully performed the required work in the past was "sufficient for a reasonable jury to conclude [Appellant] could perform the essential functions of the [position]"); *EEOC v. Hibbing Taconite Co.*, 720 F. Supp. 2d 1073, 1080 (D. Minn. 2010) (Appellant performed similar work for nine years); *Sprague v. United Airlines, Inc.*, No. Civ. A. 97-12102, 2002 WL 1803733, at *12 (D. Mass. Aug. 7, 2002) (mechanic demonstrated that he was qualified for a position with reasonable accommodation in part because he had successfully performed work as a mechanic with a previous employer); *EEOC v. Houston Area Sheet Metal Joint Apprenticeship Comm.*, No. Civ. A.H.-00-3309, 2002 WL 1263893, at *8 (S.D. Tex. May 31, 2002) (finding a question of fact when accommodations for Appellant had been successful at a previous job). The only reason given by MPS for refusing to recall Fischer is the perception from the CRT assessment that the physical condition of his back made him unable to lift, push, or pull and a risk for the job.

23

MPS told Fischer that he "didn't pass" and was "bypassed on the list" because of his "back." (AA 30, 36-7, 65, 74-5). In depositions and its statement to the EEOC, MPS considered Fischer disabled under the law. (AA 123). MPS wrote that Fischer "is not physically capable of performing the essential functions of the job" and added:

> Mr. Fischer's BIS of 197.5 indicates his job performance would potentially endanger not only other employees but himself when required to pull, or carry, or push, or lift a heavy load, or otherwise. Thus, he being incapable of pulling, carrying, pushing, or lifting a heavy load, creates a substantial risk of injury in the workplace.

(AA 123).

MPS wrote that his "job performance would potentially endanger not only other employees but himself." (AA 123). MPS witnesses testified that they regarded Fischer as disabled. (AA 105-6) ("incapable of pulling, carrying, pushing, or lifting a heavy load" and that his performing the work of a Janitor Engineer "creates a substantial risk of injury in the workplace"); (AA 292) (Employee Relations Director Mason agreed that MPS considered Fischer incapable of doing his job due to his physical condition because he failed the CRT test); (AA 199, 202) (Since Fischer failed the CRT test, MPS considered him not physically qualified to do the job and would be considered to "stand a higher risk of injury than someone who was able to pass it").

24

Despite saying and writing these things about Fischer, MPS was unaware of any specific injury that would befall Fischer had he returned to work or any other employees which needed protection from him. (AA 143, 199, 202). Fischer certainly demonstrated a genuine issue of material fact on whether he was regarded as having a disability under federal and state law.

**B.      Fischer was Qualified to do the Job.**

"Qualified" means that the individual satisfies the requisite skill, experience, education, and other job-related requirements of the position. 29 CFR § 1630.2(m); *see also Rehrs v. Iams Co.*, 486 F.3d 353, 356 (8th Cir. 2007); *Cravens v. Blue Cross & Blue Shield of Kansas City*, 214 F.3d 1011, 1016 (8th Cir. 2000). An employee need only show they meet the "minimum objective qualification of the job." *State by Khalifa v. Hennepin County*, 420 N.W.2d 634, 640 (Minn. App. 1988) *rev. den.*

Fischer performed the actual job for two years and was commended for his performance. He holds the Boiler's license required for the position and has continued to perform similar work since his layoff in 2010. He can perform the essential functions of the position with or without reasonable accommodation. *Id.*

Fischer was examined by an occupation health physician, Thomas C. Jetzer, MD MPH. (AA 294, 305-14). Dr. Jetzer has done thousands of fitness exams and is a noted expert on standards for analyzing the fitness of employees. (AA 294-

303). Dr. Jetzer has opined that Fischer can meet the essential functions of the position with or without reasonable accommodation. (AA 310). *See LaMott v. Apple Valley Health Care Center, Inc.*, 465 N.W.2d 585, 589 (Minn. App. 1991) (Testimony of employee, physician and job coach that employee could meet essential functions demonstrated a prima facie case).

### C.     Fischer Suffered Adverse Action.

An adverse employment action is an action that "produces a material employment disadvantage," such as a termination, a constructive discharge, a cut in salary or benefits, or a "change[ ] that affect[s] an employee's future career prospects." *Clegg v. Ark. Dep't of Corr.*, 496 F.3d 922, 926 (8th Cir. 2007).

Here, Fischer lost his right to recall to a job he treasured and the seniority of his union membership. If he reapplied, he has less opportunity to obtain employment, depending on the recall of other employees according to the collective bargaining agreement; and if hired, he would be at the bottom of the seniority list and closest in line for the next layoff. Fischer has suffered an adverse impact.

### D.     MPS Violated the ADA and MHRA by Its Use of the CRT Test.

1.     MPS Made Inappropriate Medical Inquiries.

In Alfredson's testimony and MPS' position statement, the CRT test was considered a pre-employment or pre-offer test. (AA 101-2, 123-4). Federal and state law prohibit employers from making medical inquiries or implementing

Appellate Case: 14-2245     Page: 33     Date Filed: 07/24/2014 Entry ID: 4178967

medical tests at the pre-offer stage. 29 CFR § 1630.13(a); EEOC Enforcement Guidance: Pre-employment Disability-Related Questions and Medical Examinations, p. 14, 8 FEP Manual 405:7197 (1995); EEOC Enforcement Guidance: Disability-Related Inquiries and Medical Examinations of Employees Under the Americans with Disabilities Act; EEOC Technical Assistance Manual §§ 5.5, 6.1, 6.2, 6.3; Minn. Stat. § 363A.20, Subd. 8; *Huisenga v. Opus Corporation*, 494 N.W.2d 469, 474 (Minn. 1992).

Here, Fischer was required to complete a form making specific and general inquiries into his health concerns, whether it be his spine, joints, medical providers, prior injuries, respiratory systems, etc. In addition they recorded his pulse and blood pressure. These prohibited inquires specifically violate the disability discrimination laws and demonstrate genuine issues of material fact precluding dismissal on summary judgment.

### 2.    MPS Performed a Medical Examination.

Directors Stromberg and Bendel, and even Alfredson later in her deposition, testified that the CRT test was to be made "post-offer" after Fischer had been hired for the Janitor Engineer position. (AA 106, 135, 138, 144, 195-6, 198-200). According to CRT, its test was to be done pre-employment, before any job offer had occurred. (AA 175-7, 243-81).

As noted in CRT's materials:

A pre-offer test has substantial benefits over a post-offer medical examination. With a medical test, should an applicant challenge a job rejection, and the employer rejected the applicant following a disability-related question or examination, "EEOC investigators will closely scrutinize whether the rejection was based on the results of that question or examination." If the question or examination screens out an individual because of a disability, the employer must demonstrate that the reason for the rejection is "job-related and consistent with business necessity."

If the applicant is disqualified based on a disability, the employer must show there is no reasonable accommodation that would enable the individual to perform the essential job functions or that the necessary accommodation would impose an undue hardship on the employer.

In a pre-offer strength and agility evaluation, all of the issues related to unknown disabilities are absent. Applicants can be rejected for employment simply based on their inadequate capability to perform the essential job functions without regard to disability.

(AA 177).

CRT warned that "[s]trength and agility tests do not typically turn into medical examinations unless the employer, for example, adds an applicant's blood pressure, heart rate or lung function to the evaluation." (AA 176); *see also* EEOC Enforcement Guidance: Pre-employment Disability-Related Questions and Medical Examinations, p. 14, 8 FEP Manual 405:7197 (1995).

Here, MPS sent Fischer to a medical office, recorded his blood pressure, heart rate, medical history, height and weight in addition to the CRT test. This was a medical examination, not an agility test. (AA 312); *see also* 29 CFR § 1630.14; EEOC Technical Assistance Manual § 6.2.

Having performed a medical test, MPS must demonstrate that the withdrawal of the job offer was job-related and consistent with business necessity, the person is being excluded to avoid a "direct threat" to health and safety, and, no reasonable accommodation was available that would enable the person to perform the essential job functions without a significant risk to health or safety, or that such an accommodation would cause undue hardship. EEOC Technical Assistance Manual § 6.4; 29 CFR § 1630.14(b); Minn. Stat. § 363A.25.

MPS cannot show the CRT test was job related and consistent with business necessity. The reasons given for its use was that two other districts were considering preplacement exams and a couple of non-specific workers' compensation injuries occurred. However, MPS did not feel it was hiring people that were prone to injury and was unaware of any particular concern of persons being injured on the job or any experience that would lead to the need for a CRT test. (AA 134, 193). They did not even treat employees in the same job classification similarly, testing no existing employees and less than half of those laid off with Fischer. With regard to other employee classifications, MPS quit using the test altogether, because of its inconsistent results.

Dr. Jetzer, who has vast experience in analyzing employees for fitness for duty, considers the generic CRT test unreliable in assessing performance. The test

Appellate Case: 14-2245    Page: 36    Date Filed: 07/24/2014 Entry ID: 4178967

does not mimic job requirements and are not narrowly tailored to the performance of job-related functions. (AA 311-14); 29 CFR § 1630.14.

Second, in order to label Fischer as presenting a "direct threat" to his own health or safety or that of others, MPS must show "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." *EEOC v. Wal-Mart Stores, Inc.*, 477 F.3d 561, 571 (8th Cir. 2007). This defense must be based on a reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence, and upon an expressly individualized assessment of the individual's present ability to safely perform the essential functions of the job. 29 CFR § 1630.2(r); *Chevron U.S.A., Inc. v. Echazabal*, 536 U.S. 73, 86 (2002); *Eldredge*, 809 F.Supp. 2d at 1033. A "slightly increased risk is not enough to constitute a direct threat, there must be a high probability of substantial harm." *EEOC v. Hibbing Taconite*, 720 F.Supp. 2d at 1082 (citations omitted). Factors to be considered are: "(1) the duration of risk, (2) the nature and severity of the potential harm, (3) the likelihood that the potential harm will occur, and (4) the imminence of the potential harm." *Id.*; 29 CFR § 1630.2(r). The burden lies with MPS to prove that Fischer posed a direct threat. *Id.* This assessment must be based on individualized factual data, not "stereotypic or patronizing assumptions" and must consider reasonable accommodations. 29 CFR § 1630.2(r) Interpretive Guidance.

Here, MPS made nothing but the most generalized assessment. MPS cannot identify any harm that Fischer or anyone around him might suffer, the extent of such harm, or even any occasion where such harm might occur. Dr. Jetzer, who examined Mr. Fischer, finds no risk posed by Mr. Fischer to himself or anyone else by performing the position of Janitor Engineer.

Finally, MPS would not consider an accommodation, even one it offered to special education assistants who failed the CRT test. Despite having knowledge of obvious mistakes on the CRT reporting form ("teacher" position, height of 15 inches and weight of 69 pounds), their own observations of an obviously healthy person, the knowledge that the person had worked for two years in the position, MPS did nothing. It would not engage in any interactive process with Fischer and blindly and mechanically accepted the CRT result. The law requires that employers consider these issues on a case by case basis, not mechanically and blindly apply policies and criteria. Employers are expected to be flexible and deal with issues on a case by case basis and not be cemented into rigid policies and procedures. *See Garcia-Ayala v. Lederly Parenterals, Inc.*, 212 F.3d 638 (1st Cir. 2000); *Heise v. Genuine Auto Parts, Co.*, 900 F. Supp. 1137 (D. Minn. 1995). By utilizing a medical examination to disqualify Fischer post-offer, MPS had an obligation to engage in an interactive process with him. MPS completely refused. The failure to enter into the interactive process is prima facie evidence of bad faith, and that when

Appellate Case: 14-2245    Page: 38    Date Filed: 07/24/2014 Entry ID: 4178967

such bad faith is present, summary judgment is not generally appropriate. *EEOC v. Hibbing Taconite*, 720 F.Supp. 2d at 1083 (citations omitted); *Eldredge,* 809 F.Supp. 2d at 1034.

## II.     <u>MPS ENGAGED IN REPRISAL AGAINST FISCHER.</u>

Fischer also asserts a claim for reprisal as, following his complaints about discrimination and requests for accommodation, he was essentially terminated from his recall position by his loss of seniority. The ADA and the MHRA prohibit employer retaliation against any employee due to the employee's complaints about discrimination. 42 USC § 12203(a); Minn. Stat. § 363A.15. To establish a prima facie claim of retaliation, Fischer must show that: (1) he engaged in statutorily protected activity; (2) a materially adverse action was taken against him; and (3) the materially adverse action was taken in retaliation for his engaging in protected activity. *Stewart v. Indep. Sch. Dist. No. 196*, 481 F.3d 1034, 1043 (8th Cir. 2007); *Heisler v. Metro. Council*, 339 F.3d 622, 632 n. 6 (8th Cir. 2003).

Fischer raised to multiple MPS managers and employees the unfairness of the action against him. He was not permitted the simple opportunity of a retest despite other employees receiving that opportunity. He not only was refused a position, he lost his seniority and ability to be recalled in the future. Despite being required to demonstrate "documented good faith efforts" to work with Mr. Fischer and having the burden of proof that he could not be accommodated, MPS still did nothing.

32

Minn. Stat. §§ 363A.03, Subd. 36; 363A.08, Subd. 6(b)(5). This is reprisal under Minnesota law.

### III. THE TRIAL COURT DID NOT FOLLOW ACCEPTED STANDARDS IN GRANTING SUMMARY JUDGMENT TO MPS.

As noted earlier in this brief, in deciding summary judgment, the trial court must view the facts "in the light most favorable to the nonmoving party" and "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Torgerson*, 643 F. 3d at 1042, *citations omitted*. Judge Doty did not follow these precepts in his Order granting summary judgment. (Appellant Addedum pp. 1-13). Facts were ignored, credibility was assessed, and inferences made to prevent Fischer the opportunity to present these issues for legitimate jury consideration.

As to facts, Judge Doty's decision makes no mention of the CRT forms testing him for a "teacher" position, recording his weight at 69 pounds or his height at 15 inches, facts that genuinely support a failure in the testing process. The decision fails to consider the fact that MPS provided no rationale as to why it required the use of the CRT test in the first place and why a score of 197.5 rather than 201 made Fischer "incapable" of performing the position or creating a risk of harm to himself or others. The decision did not consider that the CRT test failed so miserably MPS quit using it for education assistants or that education assistants

33

were allowed retests but not Fischer. The decision does not take into account at all MPS's misuse of the pre-offer and post-offer testing requirements and the fact this was an improper medical examination, all material evidence of MPS' intention to violate federal and state disability discrimination law.

The decision did contain an assertion that an employer does not consider a person disabled because they have failed to meet a condition of employment. (Appellant Addendum p. 7). In support of that assertion, the trial court cited *Jenkins v. Medical Laboratories of Eastern Iowa,* 880 F.Supp. 2d 946 (N.D. Iowa 2012) and *Fuqua v. Unisys Corporation*, 716 F. Supp.1201 (D. Minn. 1989). Id. However, both cases considered pre-ADAAA law and required the plaintiff to show a "substantial" impairment, which is no longer required under the post-ADAAA statute. See 42 USC § 12102(a)(3)(B); 29 CFR § 1630.2(j)(2) (whether an impairment "substantially limits" a major life activity is not relevant for regarded as discrimination). Moreover, the trial court's decision completely ignores MPS' stated reason that Fischer was "incapable" of performing the work and presented a "risk of harm," not that he did not meet a qualification requirement. MPS took the position that Fischer had a back problem that prevented him from working. The trial court did not interpret the law broadly, as expected in the post-ADAAA arena; it applied the law quite narrowly. The trial court should be reversed and the case remanded.

"The question of an employer's intent to discriminate is a 'pure question of fact.'" *Sischo-Nownejad v. Merced Cmty. Coll. Dist.*, 934 F.2d 1104, 1111 (9th Cir. 1991) (*quoting Pullman-Standard v. Swint*, 456 U.S. 273, 287-88 (1982)). However, as to MPS's statements, the trial court ignored the testimony of MPS decision-makers Alfredson, Bendel, Mason and Strombeck that they regarded Fischer disabled. The trial court incredibly labeled the MPS EEOC position statement as "not probative of whether MPS regarded Fischer as disabled during the relevant time period" even though it parroted MPS beliefs at the time Fischer's recall was rescinded. (Appellant Addendum p. 9, fn. 5);(AA 105-6). This Court has considered the statements of a party to the EEOC as quite probative. In *Maschka v. Genuine Parts Company*, 122 F.3d 566 (8th Cir. 1997), this Court considered the relevance of a letter by an employer to the EEOC as to the reasons for its actions. The Court affirmed the trial court's introduction of the letter. *Id.*, at 570. The Court addressed the issue raised by Judge Doty that it contained the opinion of someone else. The Court wrote:

> At most, this circumstance would affect the weight of the claim that [the employer's] reasons changed over time. That is a determination for the trier of fact, not the Court."

*Id.*, at 570-71.

The same result should follow here and a jury should determine the weight of MPS' statements to the EEOC.

Appellate Case: 14-2245   Page: 42   Date Filed: 07/24/2014 Entry ID: 4178967

The Trial Court decided that Fischer "adduced no evidence...that any MPS employee attributed his CRT assessment score to any perceived impairment." (Appellant Addendum p. 9). The only way the Trial Court could reach this opinion was to discount Fischer's and his family's sworn testimony that MPS employees told them that he did not pass the test because of his back. The Court discounted this testimony as "subjective perceptions" of Fischer rather than admissions to him by MPS that it regarded him as disabled. (Appellant Addendum p. 10). It is difficult to imagine a more obvious example of a trial court making a credibility decision that should be left to a jury. Justice Rehnquist, the author of *Celotex*, explained why trial courts should not engage in such credibility determinations:

> It has long been established that it is inappropriate to resolve issues of credibility, motive, and intent on motions for summary judgment. It is equally clear that where such issues are presented, the submission of affidavits or depositions is insufficient to support a motion for summary judgment.
>
> ***
>
> Summary judgment simply may not be granted when such matters as the Appellee's motive and intent are questioned.

*Hardin v. Pitney-Bowes, Inc.*, 451 U.S. 1008, 1009-10 (1981) (citations omitted). A jury should decide whether the weight of this testimony is a "subjective perception" or whether this testimony, coupled with that of the MPS employees, demonstrates that Fischer was considered disabled.

36

Finally, the trial court criticized the occupational medicine physician who examined Fischer in the case. (Appellant Addendum p. 8). The trial court did not consider the opinion that the CRT test did not measure the proper job parameters. While the physician observed, from the review of the testimony and documents in the case, that MPS considered Fischer disabled, the trial court wrote that the physician "examined Fischer in 2013 and has no basis to opine on whether MPS regarded Fischer as disabled in 2011." *Id.* Courts utilize medical examinations often and parties top litigation present testimony as to a person's past condition based upon examinations performed well after an event. State workers' compensation systems are based upon physicians assessing disability and causation from histories and examinations. The trial court's suggestion that a physician has no basis to opine on someone's condition because he did not examine him at the time is incredible and inconsistent with the Court's decisions under Federal Rule of Evidence 702. A ruling such as this undermines the entire Federal Rule of Civil Procedure 35 process. Fischer's obligation was to show that the expert is qualified to render the opinion and that the methodology underlying his conclusions is scientifically valid. *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 589–90 (1993). Fischer provided a report a testimony that demonstrated the reasoning or methodology in question is applied properly to the facts in issue. *Id.* at 591–93. Trained experts commonly extrapolate from existing data. *General Elec. Co. v.*

*Joiner*, 522 U.S. 136, 146 (1997). Courts should resolve doubts regarding the usefulness of an expert's testimony in favor of admissibility. *Clark v. Heidrick*, 150 F.3d 912, 915 (8th Cir.1998); *see also Arcoren v. United States*, 929 F.2d 1235, 1239 (8th Cir.1991) (noting that Rule 702 "is one of admissibility rather than exclusion"). Here, any criticism the trial court may have had to the testimony may go to its weight, an issue for a jury. The trial court should not have taken this out of their hands.

The trial court did not follow the fundamental standards that guard against the improvident granting of summary judgment. The decision should be reversed and this case remanded for jury trial.

## **CONCLUSION**

MPS wrongly perceived Fischer as disabled when he failed the CRT test and Fischer suffered the loss of his employment and seniority. When faced with this obvious error, MPS did nothing to rectify its mistake. Fischer has demonstrated genuine issues of material fact precluding summary judgment which allow his case to be heard by a jury. The trial court's decision should be reversed and the matter heard by a jury.

Dated: July 24, 2014

Respectfully submitted,

ENGELMEIER & UMANAH, P.A.

By: *s/Thomas E. Marshall*
Thomas E. Marshall
225 South Sixth Street, Suite 1230
Minneapolis, MN 55402
(612) 455-7721

ATTORNEYS FOR APPELLANT

39

## CERTIFICATE OF COMPLIANCE

## AND VIRUS FREE ELECTRONIC VERSION OF BRIEF

I, Thomas E. Marshall, certify the following pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure and Local Rule 28(h):

Appellant's brief complies with the type-volume limitation of F.R.A.P. 32(a)(7)(B) in that in contains no more than 14,000 words. Appellant's brief contains 10,702 words.

Appellant's brief was prepared in Microsoft Office Word 2007, Windows Vista Business.

In compliance with Local Rule 28(h), Appellant's brief, generated from the Word version to PDF format and filed via ECF, was scanned for viruses and was found to be virus free.

Dated: July 24, 2014

_s/Thomas E. Marshall_
Thomas E. Marshall

Appellate Case: 14-2245    Page: 47    Date Filed: 07/24/2014 Entry ID: 4178967