CASE NO.: 14-2245

_____

UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

_____

Danny Fischer,

*Appellant,*

v.

Minneapolis Public Schools

*Appellee.*

_____

Appeal from the United States District Court
For the District of Minnesota
Case No.: 14-2245

_____

**BRIEF OF APPELLEE**

_____

Jonathan P. Norrie (License #347309)
Alan I. Silver (License #101023)
BASSFORD REMELE, P.A.
33 South Sixth Street, Suite 3800
Minneapolis, MN 55402
Phone 612-333-3000

*Attorneys for Appellant*

# SUMMARY OF THE CASE

Appellant Danny Fischer sued the Minneapolis Public Schools (MPS) for disability discrimination and reprisal when he was not recalled to a janitor engineer position following a layoff. To be sure, Fischer is not disabled. But Fischer alleges that MPS regarded him as disabled because he did not achieve a "medium-heavy" score on an isokinetic measurement of physical strength and was therefore passed over for recall. Fischer also claims that MPS retaliated against him for complaining about and requesting an accommodation regarding the isokinetic measurement.

The District Court dismissed Fischer's claims on summary judgment, reasoning correctly that he had failed to establish a geniune issue of material fact on his regarded-as disability discrimination claim. Specifically, Fischer failed to establish that MPS' mere use of the isokinetic measurement test and its recall decision based solely upon the composite test score were evidence that MPS regarded him as disabled. The District Court also correctly concluded that Fischer's reprisal claim failed as a matter of law because there was no causal connection between the decision not to recall him and discussions with MPS personnel which happened after that decision.

MPS believes that oral argument will assist the Court and respectfully requests 20 minutes of oral argument per side.

i

# **CORPORATE DISCLOSURE**

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Rule 26.1A of the Eighth Circuit Rules of Appellate Procedure, Minneapolis Public Schools states that it is not a publicly held corporation.

Appellate Case: 14-2245     Page: 3     Date Filed: 08/27/2014 Entry ID: 4190344

# TABLE OF CONTENTS

Page

SUMMARY OF THE CASE ................................................................ I

CORPORATE DISCLOSURE ........................................................... II

TABLE OF CONTENTS .................................................................. III

TABLE OF AUTHORITIES ............................................................ VI

STATEMENT OF THE ISSUES ....................................................... 1

STATEMENT OF THE CASE .......................................................... 2

    **A.**    Procedural History ........................................................ 2

    **B.**    Fischer's layoff and recall ............................................ 3

    **C.**    The isokinetic CRT assessment ................................... 4

    **D.**    Fischer did not achieve the necessary CRT Body Index Score for recall to the janitor engineer position. ........................................................................ 7

    **E.**    Fischer's post-CRT interactions with MPS personnel ................................................................... 9

         1.    Mary Alfredson................................................... 9

         2.    Lisa Strombeck .................................................. 10

         3.    Gregory Bendel.................................................. 11

    **F.**    Fischer's call to Brett Crosby at Cost Reduction Technologies................................................................ 13

    **G.**    Fischer's Body Index Score ......................................... 15

    **H.**    The parties' expert reports and related motions............. 15

SUMMARY OF ARGUMENT ......................................................... 17

Appellate Case: 14-2245    Page: 4    Date Filed: 08/27/2014 Entry ID: 4190344

ARGUMENT......................................................................................18

    **I.**    Fischer fails to establish that MPS regarded him as disabled.................................................................................18

        **A.**    MPS's use of the CRT assessment does not mean it considered him impaired.............................................18

        **B.**    The erroneous height and weight data entered by the CRT technician does not create a genuine issue of material fact.............................................................26

        **C.**    MPS's retesting of special education assistants does not create a genuine issue of material fact.............28

        **D.**    Post-hoc statements by MPS personnel do not mean MPS regarded Fischer as disabled. .....................29

        **E.**    Fischer's expert testimony does not create a genuine issue of material fact.......................................31

    **II.**    Fischer was not entitled to an accommodation, nor did he request one...............................................................34

        **A.**    Fischer was not entitled to an accommodation because he asserts only a "regarded as" disability claim.........................................................................34

        **B.**    Fischer never requested an accommodation, so the "interactive process" was never triggered. ...................37

    **III.**    Fischer's unpled claims were properly disregarded by the District Court. ......................................................39

        **A.**    Fischer's unpled claims were properly dismissed..........40

        **B.**    Fischer's unpled claims also fail as a matter of law.......41

            1.    The CRT was not a pre-offer medical inquiry. ...........................................................42

Appellate Case: 14-2245    Page: 5    Date Filed: 08/27/2014    Entry ID: 4190344

2.  The data from the Minnesota Occupational Health questionnaire was not collected or used by MPS. ............................................... 43

3.  The assessment was legitimate, lawful, job-related, and consistent with business necessity. ........................................... 44

4.  MPS does not need to show that Fischer was a direct threat to himself or others. ...................... 47

**IV.**  MPS did not commit reprisal under the Minnesota Human Rights Act. ............................................... 49

**V.**  Alternatively, Fischer's state law claims are barred by official immunity. ................................................. 52

v

# TABLE OF AUTHORITIES

**Page**

## Cases

*Alexander v. Northland Inn*,
321 F.3d 723 (8th Cir. 2003) ................................................................. 21

*Am. Bldg. Contractors, Inc. v. Asset Restoration & Remodeling, LLC*,
2009 WL 3736022 (Minn. Ct. App. Nov. 10, 2009) ................................ 51

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ............................................................................... 53

*Azzam v. Baptist Healthcare Affiliates, Inc.*,
855 F. Supp. 2d 653 (W.D. Ky. 2012) .................................................... 21

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ............................................................................... 53

*Bar-Meir v. Univ. of Minn.*,
2012 WL 2402 (D. Minn. Jun. 26, 2012) ............................................... 19

*Beveridge v. Northwest Airlines, Inc.*,
259 F.Supp. 2d 838 (D. Minn. 2003) ........................................ 24, 25, 38

*Bishop v. Nu-Way Serv. Stations, Inc.*,
340 F. Supp. 2d 1008 (E.D. Mo. 2004) .................................................. 36

*Brady v. Potter*,
2004 WL 964264 (D. Minn. Apr. 30, 2004) ........................................... 44

*Buffalo Wild Wings, Inc. v. Buffalo Wings & Rings*,
2011 WL 4537970 (D. Minn. Sept. 29, 2011) ........................................ 33

*Clark v. Heidrick*,
150 F.3d 912 (8th Cir. 1998) ............................................................ 32, 33

*Cody v. Prairie Ethanol, LLC*,
2014 WL 3973094 (8th Cir. Aug. 15, 2014) ........................................... 28

*Cole v. Homier Distrib. Co., Inc.*,
599 F.3d 856 (8th Cir. 2010) ............................................................ 32, 33

*Conant v. City of Hibbing*,
131 F. Supp. 2d 1129 (D. Minn. 2000) ............................................... 1, 46

*Conant v. City of Hibbing*,
271 F.3d 782 ......................................................................................... 26

vi

Appellate Case: 14-2245    Page: 7    Date Filed: 08/27/2014 Entry ID: 4190344

*Concord Boat Corp. v. Brunswick Corp.*,
   207 F.3d 1039 (8th Cir. 2000)...................................................................32

*Cossette v. Minn. Power & Light*,
   188 F.3d 964 (8th Cir. 1999).................................................................1, 39

*Cravens v. Blue Cross & Blue Shield of Kansas City*,
   214 F.3d 1011 (8th Cir. 2000).................................................................37

*Day v. Johnson*,
   119 F.3d 650 (8th Cir.1997)....................................................................22

*E.E.O.C. v. Prod. Fabricators, Inc.*,
   2014 WL 3971477 (8th Cir. Aug. 15, 2014)...........................................1, 38

*Edstrom v. Hibbing Taconite Co.*,
   720 F.Supp.2d 1073 (D. Minn. 2010).........................................................36

*Eldredge v. City of St. Paul*,
   809 F. Supp. 2d 1011 (D. Minn. 2011).......................................................36

*Finan v. Good Earth Tools, Inc.*,
   565 F.3d 1076 (8th Cir. 2009)....................................................................19

*Fjellestad v. Pizza Hut of Am., Inc.*,
   188 F.3d 944 (8th Cir. 1999)..............................................................1, 35, 37-38

*Garcia-Ayala v. Lederle Parenterals, Inc.*,
   212 F.3d 638 (1st Cir. 2000).......................................................................37

*General Elec. Co. v. Joiner*,
   522 U.S. 136 (1997).....................................................................................32

*Gregor v. Polar Semiconductor, Inc.*,
   2013 WL 588743 (D. Minn. Feb. 13, 2013).................................................35

*Greiner v. City of Champlin*,
   27 F.3d 1346 (8th Cir. 1994).......................................................................53

*Heise v. Genuine Parts Co.*,
   900 F.Supp. 1137 (D. Minn. 1995).............................................................37

*Henke v. Allina Health Sys.*,
   698 F. Supp. 2d 1115 (D. Minn. 2010)........................................................41

*Hilton v. Wright*,
   673 F.3d 120 (2d Cir. 2012).......................................................................20

*Holman Enters. v. Fid. and Guar. Ins. Co.*,
   563 F.Supp.2d 467 (D.N.J. 2008)...............................................................33

Appellate Case: 14-2245   Page: 8   Date Filed: 08/27/2014 Entry ID: 4190344

*Hoover v. Norwest Private Mtge. Banking*,
632 N.W.2d 534 (Minn. 2001) ....................................................1, 50

*Huisenga v. Opus Corp.*,
494 N.W.2d 469 (Minn. 1992) ..................................................45

*Hunt v. Neb. Pub. Power Dist.*,
282 F.3d 1021 (8th Cir. 2002) ...............................................1, 50

*In re Initial Pub. Offering Sec. Litig.*,
174 F. Supp. 2d 61 (S.D.N.Y. 2001) ................................................33

*Kammueller v. Loomis, Fargo & Co.*,
383 F.3d 779 (8th Cir. 2004) ..............................................19

*Kari v. City of Maplewood*,
582 N.W.2d 921 (Minn. 1998) .................................1, 52, 54

*Kemp v. Tyson Seafood Grp., Inc.*,
2000 WL 1062105 (D. Minn., July 19, 2000) ...............................33

*Knutson v. Schwan's Home Serv., Inc.*,
711 F.3d 911 (8th Cir. 2013) ...............................................21

*Kratzer v. Rockwell Collins, Inc.*,
398 F.3d 1040 (8th Cir. 2005) ...............................................36, 38

*LaCross v. City of Duluth*,
2012 WL 1694611 (D. Minn. May 14, 2012) ...............................30

*Lauzon v. Senco. Prods., Inc.*,
270 F.3d 681 (8th Cir. 2003) ...............................................31

*Mays v. Rhodes*,
255 F.3d 644 (8th Cir. 2001) ...............................................31

*McDonnell Douglas Corp. v. Green*,
411 U.S. 792 (1973) ...............................................19

*McLain v. Andersen Windows, Inc.*,
2007 WL 710173 (D. Minn. Mar. 6, 2007) ...............................36

*N. Star Mut. Ins. Co. v. Zurich Ins. Co.*,
269 F. Supp. 2d 1140 (D. Minn. 2003) ...............................33

*Nelson v. County of Wright*,
162 F.3d 986 (8th Cir. 1998) ...............................................53

*Nichols v. Am. Nat. Ins. Co.*,
154 F.3d 875 (8th Cir. 1998) ...............................................41

Appellate Case: 14-2245    Page: 9    Date Filed: 08/27/2014 Entry ID: 4190344

*Peterson v. City of Plymouth,*
60 F.3d 469 (8th Cir. 1995).................................................................33

*Pletan v. Gaines*,
494 N.W.2d 38 (Minn. 1992).............................................................52

*Reeves v. Sanderson Plumbing Products, Inc.*,
530 U.S. 133 (2000)...........................................................................29

*Rico v. State*,
472 N.W.2d 100 (Minn. 1991)...........................................................52

*Riser v. Target Corp.*,
458 F.3d 817 (8th Cir. 2006)..............................................................28

*S. Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc.*,
320 F.3d 838 (8th Cir. 2003)..............................................................33

*Sanchez v. NW Airlines, Inc.*,
2012 WL 1516762 (D. Minn. May 1, 2012) ......................................19

*Schaffer v. Ramsey County*,
2002 WL 1423114 (Minn. Ct. App. July 2, 2002) .............................52

*School Bd. of Nassau County v. Arline*,
480 U.S. 273 (1987)...........................................................................26

*Scott v. Harris*,
550 U.S. 372, (2007)..........................................................................30

*Smith v. BMW N. Am., Inc.*,
308 F.3d 913 (8th Cir. 2002)..............................................................32

*Stockton v. NW. Airlines, Inc.*,
804 F. Supp. 2d 938 (D. Minn. 2011).................................................21

*Treanor v. MCI Telecommunications Corp.*,
200 F.3d 570 (8th Cir. 2000)..............................................................22

*Weber v. Strippit, Inc.*,
186 F.3d 907 (8th Cir. 1999)....................................................1, 22, 36

*Weisgram v. Marley Co.*,
528 U.S. 440 (2000)...........................................................................33

*Wells Fargo & Co. v. United States*,
750 F. Supp. 2d 1049 (D. Minn. 2010)...............................................53

*Wiederholt v. City of Minneapolis*,
581 N.W.2d 312 (Minn. 1998) ...............................................1, 5, 17, 52

ix

*Wooten v. Farmland Foods*,
  58 F.3d 382 (8th Cir. 1995)............................................................26

*XO Missouri, Inc. v. City of Maryland Heights*,
  362 F.3d 1023 (8th Cir. 2004)........................................................18

*Young v. Builders Steel Co.*,
  754 F.3d 573 (8th Cir. 2014)..........................................................28

## <u>Statutes</u>

42 U.S.C. § 12102(1)(3)..................................................................19

42 U.S.C. § 12102(3)(A)..............................................................1, 20

42 U.S.C. § 12112(d)(3)(A)-(C).......................................................44

42 U.S.C. § 2000-e.........................................................................40

Minn. Stat. § 363A.08, Subd. 2.......................................................19

Minn. Stat. § 363A.15............................................................1, 50, 51

Minn. Stat. § 363A.28, Subd. 3.......................................................40

Minn. Stat. § 363A.20, Subd. 8(a)(1)...............................................45

## <u>Rules</u>

Rule 702, Fed. R. Evid.............................................................31, 32

## <u>Regulations</u>

29 C.F.R. § 1630 App. ................................................................1, 22

29 C.F.R. § 1630(o) .......................................................................36

29 C.F.R. § 1630.14(b)(3)...............................................................45

Appellate Case: 14-2245    Page: 11    Date Filed: 08/27/2014 Entry ID: 4190344

# STATEMENT OF THE ISSUES

**1.      The District Court properly determined that the use of the CRT assessment and application of Fischer's CRT score did not violate the Americans with Disabilities Act or the Minnesota Human Rights Act.**

Apposite Authorities:

 42 U.S.C. § 12102(3)(A)

 29 C.F.R. § 1630 App. (Interpretive Guidance on Title I of the Americans with Disabilities Act)

 *Conant v. City of Hibbing*, 131 F. Supp. 2d 1129 (D. Minn. 2000) *aff'd.*, 271 F.3d 782 (8th Cir. 2001)

**2.      The District Court properly dismissed Fischer's purported claims for failure to accommodate and failure to engage in the interactive process.**

Apposite Authorities:

 *Fjellestad v. Pizza Hut of Am., Inc.,* 188 F.3d 944 (8th Cir. 1999)

 *Weber v. Strippit, Inc*., 186 F.3d 907 (8th Cir. 1999)

 *E.E.O.C. v. Prod. Fabricators, Inc.*, 2014 WL 3971477 (8th Cir. Aug. 15, 2014)

**3.      The District Court properly declined to legitimize Fischer's belated attempt to add claims not pleaded in the Complaint.**

Apposite Authorities:

 *Cossette v. Minn. Power & Light*, 188 F.3d 964 (8th Cir. 1999)

**4.      The District Court properly determined that MPS did not commit reprisal against Fischer under the Minnesota Human Rights Act.**

Apposite Authorities:

 Minn. Stat. § 363A.15

 *Hoover v. Norwest Private Mtge. Banking*, 632 N.W.2d 534 (Minn. 2001)

 *Hunt v. Neb. Pub. Power Dist.*, 282 F.3d 1021 (8th Cir. 2002)

**5.      In the alternative, Fischer's state law claims would have been barred by official immunity.**

Apposite Authorities:

 *Kari v. City of Maplewood*, 582 N.W.2d 921 (Minn. 1998)

 *Wiederholt v. City of Minneapolis*, 581 N.W.2d 312 (Minn. 1998)

**STATEMENT OF THE CASE**

**A.    Procedural History**

Danny Fischer initiated the underlying "regarded as" disability discrimination lawsuit in the U.S. District Court, District of Minnesota on October 2, 2012.    His Complaint stated two claims for relief: Count I: Disability Discrimination (under the MHRA and ADA); and Count II: Reprisal (under the MHRA only).

Specifically, Fisher contends that MPS perceived him as disabled under the Minnesota Human Rights Act (MHRA) and Americans with Disabilities Act (ADA) because following a layoff, he was not recalled to a janitor engineer position after he achieved only a "medium" score instead of the required "medium-heavy" level score on a mechanical, statistically based isometric assessment conducted by a third-party vendor.  Fischer also claims that MPS retaliated against him after he requested a re-test.  The District Court granted the school district's summary judgment motion, correctly holding that Fischer's claims fell short of either regarded-as disability discrimination or reprisal, and disregarding Fischer's attempts to shoehorn new claims (never pleaded) into his summary judgment argument.  Fischer appealed.

2

**B.  Fischer's layoff and recall**

Fischer worked for MPS as a janitor engineer from March, 2008 until he was laid off, along with a number of other janitor engineers, at the end of June, 2010. (Fischer Dep. 33:20-34:4, AA-022; Furey Dep. 23:20-24, AA-060.)  Both sides agree that Fischer does not suffer from an actual "medical disability or impairment." (Appellant's Br. at 3.)

Fischer was on layoff status from July 1, 2010, until approximately December 8, 2011, when he received a recall letter from MPS.  (Fischer Dep. 39:19-40:14, AA-024.)  The letter stated that Fischer's recall was contingent on certain conditions: "[t]erms of the recall will require you to have a valid boilers license as well as complete the **CRT (Cost Reduction Technology)** assessment…if you pass at the required level and have a current boilers license, we will proceed with the recall from layoff." (Fischer Dep. Ex. 6, AA-046, emphasis added.) [1]

_____

[1] Under the collective bargaining agreement, janitor engineers were recalled from layoff by seniority.  Some janitor engineers were recalled prior to implementation of the CRT assessment process.  Every janitor engineer recalled after August 2011 or hired by MPS after that date, however, has been required to achieve a passing score on the assessment, without re-test.  This same CRT assessment protocol remains in use for janitor engineer positions until this day.  (Bendel Aff. ¶ 2, Appendix of Appellant Minneapolis Public Schools (hereinafter "MPS App.") MPS App. 11.)

3

## C. The isokinetic CRT assessment

The CRT assessment had been implemented by MPS in August, 2011, approximately four months before Fischer received his recall notice. (Alfredson Dep. 53:14-18, AA-103.) MPS wanted to increase job safety and reduce risk of injury in certain specific job categories, namely those that historically "had a minimum of a 50-pound lifting requirement," including janitor engineers. (Strombeck Dep. 31:3-9, AA-133.)

As implemented by MPS, the CRT assessment[2] consists of multiple isokinetic[3] measurements conducted by a third-party technician using a CRT machine owned by Cost Reduction Technologies, the company that developed the machine. The CRT machine is located at Minnesota Occupational Health, not on MPS property. (*See* Fischer Dep. Ex. 9, AA-050.) Data from an individual's CRT measurements is combined into a single Body Index Score, based on an algorithm developed by Cost Reduction Technologies using normative statistical data. (Crosby Aff. ¶ 2, MPS App. 1.) An individual's single composite Body Index

---

[2] The CRT assessment process is described on the materials provided to test-takers as "an isokinetic test, which can safely determine the physical capability of an individual. The CRT test is used to match your physical strength to the physical strength requirements of the essential functions of the job." (Fischer Dep. Ex. 9, AA-0050.) For consistency, the terms "CRT test" or "CRT assessment" are used in this brief to refer to the testing process, and "Cost Reduction Technologies" refers to the company itself.

[3] Fischer's Referral and Authorization form noted that "Isokinetic equipment measures the maximum force-producing capability of muscles." (Fischer Dep. Ex. 6, AA-0048.)

Appellate Case: 14-2245    Page: 15    Date Filed: 08/27/2014 Entry ID: 4190344

Score—and only the Body Index Score—is transmitted on a score sheet to the client (here, MPS) to assist in its hiring determination. The score sheet states that "[t]he test results included here are determined by the CRT formula which combines shoulder, knee and trunk strength and functional numbers." (Fischer Dep. Ex. 9, AA-050.) The Body Index Score does not break out scores by individual body part. In other words, an individual seeing only the Body Index Score would not be able to tell what part of the score was attributable to the test-taker's trunk. (*See id.*)

Although Minnesota Occupational Health collected height and weight data, and entered that data into the CRT machine, Bret Crosby, President of CRT and the person with the closest knowledge of the CRT assessment, testified by Declaration that this data had absolutely no effect on an applicant's Body Index Score. Height and weight information is collected by Cost Reduction Technologies—not MPS—and has no bearing on the assessment results. (Crosby Decl. at ¶ 7, MPS App. 2.) Further, as noted by MPS' expert, "isokinetic testing provides indications of an individual's capacity to generate force or torque required for joint movement…The amount of force or torque necessary for joint movement is related to the strength necessary to perform jobs in specific categories." (Report of Dr. Scott D. Minor, MPS App. 7.) The amount of force an individual exerts is

5

measurable independent of height and weight, and that is what the CRT assessment does.

The Body Index Score correlates with a physical demand level based on the U.S. Department of Labor strength factor ratings.[4] (Strombeck Dep. Ex. 13, AA-173.) It is undisputed that "a candidate for a teacher position would take the same assessment, at the same machine settings, as a candidate for a janitor position." (Crosby Decl. at ¶ 8, MPS App. 2.) The only difference is that the Body Index Score for a teacher candidate would be compared to the physical demand range determined appropriate for teachers while the Body Index Score for a janitor engineer candidate would be compared against the range for janitor engineer candidates.[5]

The physical-demand level for MPS janitor engineers was determined to be "medium-heavy," based on a customized MPS task analysis performed in February, 2011 by Susan Unger, an Occupational Health Specialist with Minnesota Occupational Health. Ms. Unger's analysis included questionnaires, interviews,

---

[4] The Department of Labor strength factor ratings are listed in Appendix C of the Department of Labor Dictionary of Occupational Titles as "Sedentary; Light; Medium; Heavy, and Very Heavy." http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM. The physical strength ratings utilized in the Task Analysis and CRT assessment incorporate further intermediate levels, e.g. "light-medium" or "medium-heavy." (Strombeck Dep. Ex. 13, AA-173.)

[5] The Body Index Score range for the Medium-Heavy physical demand level is 201-225. (Bendel Dep. Ex. 23, AA-244.)

Appellate Case: 14-2245     Page: 17     Date Filed: 08/27/2014 Entry ID: 4190344

photographs, and observations of actual MPS janitor engineers performing normal job tasks. (Bendel Dep. Ex. 19, AA-213 to AA-227; Strombeck Dep. 26:6-22, AA-132; Strombeck Dep. Ex. 8, AA-146 to AA-153; Strombeck Ex. 9, AA-154 to AA-159.) Following completion of the task analysis, MPS implemented the CRT testing protocol in approximately August, 2011. (Bendel Dep. 26:1-5, AA-193.)

### D. Fischer did not achieve the necessary CRT Body Index Score for recall to the janitor engineer position.

On December 12, 2011, Fischer took the CRT assessment at a Minnesota Occupational Health location at 1661 St. Anthony Avenue in St. Paul (not an MPS facility). Fischer understood that at the time he took the CRT assessment, he was not employed by MPS. (Fischer Dep. 49:1-4, AA-026.)

Before Fischer took the CRT assessment, he completed a questionnaire and had his blood pressure taken by a technician. (Fischer Dep. Ex. 8, AA-049.) It is undisputed, however, that this data was never transmitted to MPS, nor was it ever utilized in any way by MPS. (Alfredson Dep. 47:17-23, AA-101.) It also appears that the technician may have entered Fischer's height, weight, and job title incorrectly. (Strombeck Dep. Ex. 14, AA-174.) As explained above, however, despite Fischer's unsupported speculation, it is also undisputed that the technician's error did not affect Fischer's Body Index Score.

Moreover—and perhaps more relevant to a summary judgment argument—it is absolutely undisputed that <u>no individual at MPS ever saw the height and weight</u>

7

data until after this lawsuit began. The only information received by MPS, and the only information it could have considered, was (1) whether Fischer had a valid boiler's license and (2) whether Fischer achieved a "medium-heavy" level score on the CRT assessment. (Alfredson Dep. 47:17-23, AA-101.)

Also prior to taking the CRT assessment, Fischer signed a form (which he had received along with the recall letter) stating, among other things:

- "You must push and pull as hard and as fast as you can throughout the entire motion on every repetition."

- "I have read the above information and I understand that I will be asked to give maximum effort and that I will be performing short bouts of strenuous activity."

(Fischer Dep. 47:18-48:12; 49:8-23, AA-026.) Fischer testified that the CRT assessment "was like a really weird machine that you did five arm reps and then you did five leg reps and then you did five back reps ... And that was pretty much it." (Fischer Dep. 46:21-25, AA-026.) He recalls that the technician at one point instructed him to go faster "on the back one." (Fischer Dep. 47:1-4, AA-026.) He believes he gave maximum effort but "had never been on the machine before." (Fischer Dep. 47:14-17, AA-026.)

Fischer's Body Index Score, the information transmitted to MPS by Minnesota Occupational Health, was 197.5. A score of 197.5 falls within the medium strength range but does not reach the medium-heavy level for a janitor

8

engineer position, which requires a minimum score of 201. (Bendel Dep. Ex. 18, AA-211.)

### E. Fischer's post-CRT interactions with MPS personnel

#### 1. *Mary Alfredson*

On approximately December 18, 2011, Fischer was informed by MPS's Human Resources Consultant Mary Alfredson that he had not passed the CRT test at the requisite level. (Fischer Dep. 50:13-16, AA-027.) Ms. Alfredson told Fischer that he was being "bypassed" on the recall list and he understood that MPS had decided that he would not be getting his job back. (Fischer Dep. 54:4-15; 59:14-19, AA-028 to AA-029.)

Mary Alfredson's interactions with regard to Mr. Fischer were limited to issuing his recall notice, receiving his one-page Body Index Score sheet, and notifying him that he was being bypassed on the recall list. Her understanding of the Body Index Score was that "[b]ased on the position that a person is being tested for, there is a range. So that number would have meant where he fell in the range." (Alfredson Dep. 41:24-42:6, AA-100.) Ms. Alfredson had no involvement in setting the range. (*Id.* at 42:23-25, AA-100.) She was never told what the Body Index Score or the range chart meant. (*Id.* at 67:24-68:14, AA-106.) She merely applied the result to determine whether it fell within the acceptable range. In Mr.

9

Fischer's case, it did not. (*Id.* at 49:19-21; 51:2-4, AA-102.) Ms. Alfredson was never aware of any issues with Mr. Fischer's back. (*Id.* at 59:14-19, AA-104.)

2. *Lisa Strombeck*

Fischer next contacted MPS employee Lisa Strombeck, who only confirmed that he was being bypassed on the recall list. (Fischer Dep. 63:4-24, AA-030.) According to Fischer, this was "maybe a couple days" after his communication with Mary Alfredson. (Fischer Dep. 62:15-17, AA-030.) Later in his deposition, Fischer changed his testimony to claim that he was told by Ms. Strombeck that he would not be allowed to come back to work "because of my back and I didn't pass a physical." (Fischer Dep. 88:8-90:12; 93:8-14, AA-036 to AA-037.) Fischer later claimed that she said "based upon my back, that I would not be re-hired, because I would be perceived as a risk." (Fischer Dep. 93:10-14, AA-037.)

Ms. Strombeck does not recall any specific discussions with Mr. Fischer (Strombeck Dep. 63:9-16, AA-141), but even accepting Mr. Fischer's internally inconsistent testimony for purposes of summary judgment analysis, Fischer has not established that Ms. Strombeck received any information specifically about Mr. Fischer's back score or that presenting a risk to MPS was the same thing as a disability. In any case, Fischer testified that he spoke to Ms. Strombeck after speaking to Mary Alfredson. (Fischer Dep. 62:1-2, AA-030.)

Appellate Case: 14-2245    Page: 21    Date Filed: 08/27/2014  Entry ID: 4190344

### 3. *Gregory Bendel*

At some point after his conversation with Ms. Alfredson, Mr. Fischer asked Gregory Bendel (whom he identified at his deposition as "Gary Bendel") about re-taking the CRT assessment. When the CRT assessment protocol was first implemented, MPS had decided to follow recommended guidelines not to allow re-tests. (Strombeck Dep. 55:14-19, AA-139; Bendel Dep. 63:2-4, AA-202.) Bendel explained the rationale: "once they take the test the first time, that score is truly accurate and truly indicative of what they would be able to do on a day-to-day basis." (Bendel Dep. 63:4-7, AA-202.)

Following the MPS policy, Mr. Bendel told Fischer he could not re-test. (Fischer Dep. 66:14-17, AA-031.) Fischer also claimed that he was told by Bendel "'[y]ou did not pass based on your back." (Fischer Dep. 90:18-21, AA-037.) Shortly thereafter, however, Fischer contradicted this assertion:

> Q. How do you know that he [Mr. Bendel] knew that it was based on your back?
>
> A. Why else would they tell me I failed?
>
> Q. Okay. Well, is all that he told you is that you failed?
>
> A. Pretty much.
>
> Q. So, he didn't say anything about your back. He just said "You failed."?
>
> A. I said, "What did I fail?" They don't give you much information with the district.

11

Q.   Just to make sure I'm clear, your testimony is Mr. Bendel didn't say anything about your back, he just told you that you did not pass.  Is that correct?

**MR. MARSHALL:** Objection.  Misstates the testimony.  You can answer.

A.   I don't agree with that, no.

Q.   Okay.  Well, I'm struggling to understand what you're saying, because it sounds to be changing to me, and I want to make sure I understand it correctly.  So, how do you know that Mr. Bendel knew what your back score was?

A.   I don't know if he knew that.  He just told me – they all told me that I would be perceived as a risk to the company.  That's – that's basically how it's always been.

Q.   Okay.  They all told you that? Who?

A.   Lisa Strombeck, the risk management.

Q.   And what specifically did she say that you have not already told me?

A.   That I – based upon my back, that I would not be re-hired, because I would be perceived as a risk.

Q.   …And what about Mr. Bendel?  Anything that you haven't told me?

A.   Besides what I just told you, no.

Q.   Okay.  You don't have – but sitting here today, you don't have any knowledge about what anyone in the district was told by CRT or Minnesota Occupational Health –

A.   No.

Q.   -- about your score, correct?

A.   As far as I know, no. I don't personally know. I'm just going based on what I was told.

12

(Fischer Dep. 92:2-94:2, AA-037 to AA-038.)  Bendel, however, was never told anything about Fischer's back being an issue.  (Bendel Dep. 61:23-62:1, AA-202.)

As Mr. Fischer acknowledged, at the times he spoke to Alfredson, Strombeck, and Bendel, he had no information about what Cost Reduction Technologies had communicated to MPS.  In fact, prior to this litigation, the only information anyone at MPS *ever* received from Minnesota Occupational Health regarding Fischer was the single Body Index Score sheet showing only his single composite score of 197.5.  Moreover, none of these individuals were ever told that Mr. Fischer's score had anything to do with his back.  (Fischer Dep. Ex. 9, AA-050; Alfredson Dep. 50:22-51:1, AA-102; Alfredson Dep. 59:8-19, AA-104; Bendel Dep. 61:23-62:1, AA-202; Strombeck Dep. 76:22-77:4, AA-144.)

### F.    Fischer's call to Brett Crosby at Cost Reduction Technologies

In fact, no one outside of Cost Reduction Technologies could have known Fischer's back score, because only Cost Reduction Technologies received the data in a way that allowed for analysis of individual body areas.  (Crosby Aff. ¶ 5, MPS App. 2.)  No MPS personnel ever contacted Cost Reduction Technologies with regard to Fischer or his score.  In fact, it was Fischer himself who eventually contacted Brett Crosby, President of Cost Reduction Technologies.  (Fischer Dep. 69:4-12, AA-031.) Fischer claims that Crosby told him that he had passed the arm and leg portion of the test, but that his "back" score was "126 or 127 out of a 140"

13

which negatively affected his composite Body Index Score. (Fischer Dep. 70:2-4, AA-032.)

Despite Fischer's claims that he had already been told by Strombeck and Bendel that he did not pass because of his back, he testified that his conversation with Crosby was the first time anyone had explained to Fischer about the "arm, leg, back" testing or how Fischer had failed. (Fischer Dep. 69:4-70:10, AA-031 to AA-032.) This fact is corroborated by Fischer's mother, Lorie Furey, who also works for MPS. The first she heard of the issue with his back was from Danny Fischer, after he got the results from Cost Reduction Technologies. (Furey Dep. 84:15-16.)

Thus, the only way that anyone at MPS could have learned that Fischer's score was caused by his "back" was through Fischer himself—and he did not find out about any issue with his "back" until he spoke with Crosby. With regard to this issue, the District Court found that

> the statements at issue [made by MPS personnel] merely restated the facts relating to Fischer's performance on the CRT assessment. Fischer's post-hoc interpretations of such statements as suggestions that MPS regarded him as disabled is irrelevant. Indeed, other than Fischer's subjective perceptions, there is no evidence from which a reasonable factfinder could conclude from these statements that MPS regarded him as disabled.

(Order p. 10, AA-010.)

14

### G.   Fischer's Body Index Score

As noted above, Fischer's Body Index Score was 197.5.  This corresponds "to a physical strength designation of Medium."  (Order, AA-002.)  At the time that Fischer spoke to Brett Crosby and learned his leg, arm, and back scores, the determination had already been made that he was not eligible to return to work.  In fact, that determination was made before Fischer ever heard from Mary Alfredson back in December of 2011.  (Fischer Dep. 59:20-24, AA-029.)

As the District Court correctly noted, failing to achieve a passing score was not a permanent bar to employment with MPS, or even employment in the same position.  An applicant who did not pass could have applied for another open position—even a janitor engineer position—and been treated like any new applicant.  (Order, AA-007 to AA-008; *see also* Strombeck Dep. 64:19-24, AA-141.)  Mr. Fischer implicitly acknowledges this in his brief when he argues that the "adverse action" taken against him was losing "his right to a job he treasured and the seniority of his union membership."  (Appellant's Br. at 26.)

### H.   The parties' expert reports and related motions

Fischer and MPS each identified a testifying expert who provided a report: Dr. Thomas Jetzer for Fischer (AA-294 to AA-314) and Dr. Scott Minor for MPS.  (MPS App. 3-10.)   Fischer and MPS exchanged expert opinions.   MPS then brought a summary judgment motion before the Honorable David Doty.  MPS also

brought a motion to exclude Dr. Jetzer's testimony. Each side cited to their expert's opinion in their summary judgment motion briefing. Judge Doty heard oral argument on MPS' motions on January 10, 2014. On April 28, 2014, Judge Doty granted MPS' motion for summary judgment in full, dismissing both claims of Fischer's Complaint. He also dismissed MPS' Motion to Exclude as moot. (Order at 12-13, AA-012 to AA-013.) Judgment was entered on April 29, 2014. Fischer appeals from the Order granting summary judgment to MPS.

Appellate Case: 14-2245    Page: 27    Date Filed: 08/27/2014 Entry ID: 4190344

## SUMMARY OF ARGUMENT

Fischer's arguments on appeal are no more than a re-hashing (and large part, a near-verbatim recitation) of his unsuccessful arguments opposing summary judgment. The District Court properly applied the correct summary judgment standards in determining that Fischer did not establish a genuine issue of material fact on either of the claims actually pleaded.

First, despite Fischer's unsupported statements to the contrary, the District Court properly evaluated Fischer's disability discrimination arguments under both the MHRA and the ADA (as amended by the Americans with Disabilities Amendment Act) because the court applied the more stringent "impairment" definition found in the current ADA. (Order at 9, AA-009.)

Second, the District Court also correctly held that Fischer could not establish reprisal because to the extent Fischer's conduct was protected activity under the MHRA, it occurred after any adverse employment action had already occurred, and therefore could not support a reprisal claim. (*Id.* at AA-011 to AA-012.)

Finally, in making its analysis, the District Court properly applied the facts while disregarding Fischer's attempt to add claims not pleaded in his Complaint. (*Id.* at AA-006 to AA-007, noting that "[a]n employer…may generally make pre-employment inquiries into the ability of an applicant to perform job-related functions or require post-offer medical inquiries and examinations.")

Appellate Case: 14-2245    Page: 28    Date Filed: 08/27/2014 Entry ID: 4190344

**ARGUMENT**

## I. FISCHER FAILS TO ESTABLISH THAT MPS REGARDED HIM AS DISABLED.

### A. MPS's use of the CRT assessment does not mean it considered him impaired.

Fischer argues in his brief that the Honorable David Doty mistakenly applied pre-ADAAA law to Fischer's post-ADAAA claims.[6] (Appellant's Br. at 34.) To support this position, Fischer contends that that his CRT results meant that MPS considered him "impaired." (See Appellant's Br. at 23, alleging that "[t]he only reason given by MPS for refusing to recall Fischer is the perception from the CRT assessment that the physical condition of his back made him unable to lift, push, pull and a risk for the job." The District Court noted that "the ADA and MHRA distinguish between being regarded as physically unqualified for a particular job and being regarded as "disabled." (Order, AA-007.) Fischer's arguments to the contrary contravene existing regulations, case law, and common sense.

First, Fischer does not dispute that the District Court applied the correct analytical framework here. Absent direct evidence of discrimination, disability

---

[6] Fischer does not appear to argue that he was "regarded as" disabled under the narrower standard of the MHRA, so this claim is waived. *XO Missouri, Inc. v. City of Maryland Heights*, 362 F.3d 1023, 1025 (8th Cir. 2004). Even if Fischer could make such a claim, the District Court correctly noted that the MHRA analysis is similar to the standards under the prior version of the ADA, and is "less stringent" than the new ADAAA standards. Because Fischer's claim failed under the more stringent standard, it also failed under the MHRA. (Order, AA-005 n. 2, 4.)

Appellate Case: 14-2245    Page: 29    Date Filed: 08/27/2014 Entry ID: 4190344

discrimination claims "should be analyzed under the familiar three-step framework described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). *Sanchez v. NW Airlines, Inc.*, 2012 WL 1516762 at *5 (D. Minn. May 1, 2012). Fischer acknowledges that the *McDonnell Douglas* framework is appropriate. (Appellant's Br. at 21.)

Under the *McDonnell Douglas* analysis structure, a plaintiff must show:

(1) [the plaintiff] had a disability within the meaning of the ADA and MHRA;

(2) [the plaintiff] was qualified to perform the essential functions of [his] job, with or without reasonable accommodation, and

(3) [the plaintiff] suffered an adverse employment action because of [his] disability.

*Bar-Meir v. Univ. of Minn.*, 2012 WL 2402 at *3 (D. Minn. Jun. 26, 2012), citing *Finan v. Good Earth Tools, Inc.*, 565 F.3d 1076, 1079 (8th Cir. 2009).

Here, the disability discrimination claimed by Fischer is not due to an actual disability, but a "regarded as" disability, prohibited under both the ADA and MHRA. 42 U.S.C. § 12102(1)(3); Minn. Stat. § 363A.08, Subd. 2. Up until the ADAAA, the "regarded as" or "perceived as" analysis was the same for both statutes. *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 789 (8th Cir. 2004). Effective January 1, 2009, certain provisions of the ADA were amended by the Americans with Disabilities Amendment Act, or ADAAA.

Appellate Case: 14-2245    Page: 30    Date Filed: 08/27/2014 Entry ID: 4190344

The ADAAA significantly broadened the potential use of the "regarded as" disability claim by simply requiring the person to be perceived as "impaired," and no longer requiring analysis of whether the so-called impairment limits a major life activity. The statutory language now reads:

> An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment *whether or not the impairment limits or is perceived to limit a major life activity*.

42 U.S.C. § 12102(3)(A) (emphasis added). Here, the District Court properly noted and applied this standard in its Order, holding that "Fischer has adduced no evidence…that any MPS employee attributed his CRT assessment score to any perceived *impairment*." (Order, AA-009, emphasis added.)

Fischer incorrectly claims, however, that the District Court failed to properly apply the new "regarded as" standard under the ADAAA. First, although little caselaw exists under the "new" ADA, even under the more lenient definition of "regarded as" disability, a plaintiff is still required to raise a genuine issue of material fact about whether he is regarded as "having a mental or physical impairment;" but is "not required to present evidence of how or to what degree they believed the impairment affected him." *Hilton v. Wright*, 673 F.3d 120, 129 (2d Cir. 2012).

Even under the more lenient ADA standard, summary judgment is still available for the employer where the employee is not qualified for the position. *See Knutson v. Schwan's Home Serv., Inc.*, 711 F.3d 911, 914 (8th Cir. 2013) (with regard to sales manager not medically qualified to drive a truck but whose job duties would have involved driving from "time to time," "this court need not decide whether [plaintiff] was disabled under the ADAAA, because assuming, without deciding, that he was disabled, he was not qualified to perform an essential function of his job.") *See also Azzam v. Baptist Healthcare Affiliates, Inc*., 855 F. Supp. 2d 653, 662 (W.D. Ky. 2012) (employee not otherwise qualified for position as surgical RN because she could not and would not assume normal schedule).

When analyzing whether a person is qualified for a particular position, "[a]n employer's judgment regarding the essential functions of its job is considered "highly probative." *Stockton v. NW. Airlines, Inc*., 804 F. Supp. 2d 938, 949 (D. Minn. 2011), citing *Alexander v. Northland Inn*, 321 F.3d 723, 727 (8th Cir. 2003). The court is required to

> consider whether the person has "the requisite skill, experience, education and other job-related requirements of the employment position that such individual *holds or desires*." …We agree with the district court's assessment that a court cannot evaluate a plaintiff's qualifications in a vacuum but must consider the specific essential functions of a particular job. The ADA does not prevent an employer from terminating a disabled person who is not qualified to perform the essential functions of a particular and available job.

21

*Treanor v. MCI Telecommunications Corp.*, 200 F.3d 570, 575-76 (8th Cir. 2000), citing *Weber v. Strippit, Inc.*, 186 F.3d 907, 916 (8th Cir. 1999); *see also Day v. Johnson*, 119 F.3d 650, 656 (8th Cir.1997) (under Title VII, a court "must ask whether the job applicant was qualified for a particular available position") (emphasis added).

The EEOC's interpretive guidance stresses the importance of evaluating the employee's capabilities at the time the employment decision is made:

> The determination of whether an individual with a disability is qualified is to be ***made at the time of the employment decision***. This determination should be based on the capabilities of the individual with a disability at the time of the employment decision, and should not be based on speculation that the employee may become unable in the future or may cause increased health insurance premiums or workers compensation costs.

29 C.F.R. § 1630 App. (Interpretive Guidance on Title I of the Americans with Disabilities Act). This is precisely what MPS intended the CRT assessment to accomplish. This is corroborated by the fact that Fischer could have reapplied for another available position in 2013, or in fact, at any time. (Strombeck Dep. 64:19-24, AA-141.) Fischer's argument that he passed a "strenuous" test to obtain his current position is unavailing for the same reason – it has nothing to do with his CRT results in 2011.

Achieving a medium-heavy result on the CRT assessment was a qualification for a janitor engineer position. The CRT assessment was intended to

Appellate Case: 14-2245    Page: 33    Date Filed: 08/27/2014 Entry ID: 4190344

evaluate whether newly applying candidates or potentially recalled candidates like Fischer "could safely perform all the essential functions of the job." (Strombeck Dep. 71:11-13, AA-143.) As the District Court held, Fischer has not established that the District regarded his failure to achieve a medium-heavy level on the CRT test as an "impairment." Once the CRT assessment protocol was implemented, it applied to all janitor engineer candidates, both those recalled and those newly applying. Fischer's disagreement with the use of the CRT does not rise to the level of a material fact issue. When Fischer did not achieve the medium-heavy level in December of 2011, he simply failed to meet "a condition of employment," (Order, AA-007) which was not the same as being regarded as disabled under the ADA.

And there is no evidence that MPS perceived Fischer as an "impaired" individual just because he failed to meet the physical demand level of "medium-heavy." As described in more detail in the report of Dr. Scott Minor, isokinetic testing such as the CRT assessment is a standardized, objective method for an employer to minimize the hazards of putting an employee into a job where the employee's bodily capabilities do not match the requirements necessary to safely perform that job. As Dr. Minor further notes,

> [b]ased on a job task analysis, the strength requirements of being an ironworker are significantly higher than those required of a tailor. A person who has the strength requirements to be a tailor is *not* disabled or impaired just because he/she does not meet the strength requirements necessary to be an ironworker.

23

(Minor Report at 3, MPS App. 6.)

The physical demand level to be achieved on the CRT assessment for any particular job is set according to Department of Labor standards and an analysis of the particular job functions of the specific position. Thus, the assessment is statistically based on the level of physical exertion determined necessary for safe performance of repeated job duties in one specific position, not a determination of disability or non-disability. Fischer has not established that his achieving the level of "medium" when the position he was seeking required a "medium-heavy" level of physical demand means that he was perceived as disabled under the ADA.

Whether Fischer was qualified for a position with another company is simply immaterial. Fischer cannot dispute that the "medium-heavy" level of physical demand was based on a careful scrutiny of the specific functions of the *MPS janitor engineer* position, including lifting, pulling, and pushing. (Bendel Dep. Ex. 19, AA-213 to 228.) Even common sense suggests that an MPS janitor engineer job is a highly physical position, with significant demands on an individual's physical capability. Fischer did not meet the necessary physical capability level, and was therefore not recalled to employment as a janitor engineer.

Fischer's situation somewhat resembles the case of *Beveridge v. Northwest Airlines, Inc.* 259 F.Supp. 2d 838 (D. Minn. 2003). In *Beveridge*, an airline

24

employee who had served as a customer service agent wanted to come back to work at a different position, as a customer service specialist, following a medical leave. He took and failed a basic skills test. At that time he took the test, test-takers were allotted thirty minutes. That time was later changed to forty-five minutes. Although the employee was offered a re-test, he was prevented from retaking the test because his doctor would not "prescribe a return-to-work date for him…and, without a return-to-work date, he was told that he could not take the retest for the position." Although the employee had previously performed similar tasks when he worked as a customer service agent, the court still found that he was not qualified for the customer service specialist position "because he did not pass the required testing." The plaintiff did not suffer an adverse employment action because of his disability. Rather, it was simply because he had not passed the required skills test. *Id.* at 860-861.

Similarly, Mr. Fischer has not established that his achieving the level of "medium" when the position he was seeking required a "medium-heavy" level of physical demand means that he was perceived as disabled. Even post ADAAA, the applicable federal Equal Employment Opportunity Commission (EEOC) guidance makes clear that an employer is entitled to conduct strength and agility testing. The District Court correctly noted that both the ADA and the MHRA "distinguish between being regarded as physically unqualified for a particular job and being

25

regarded as 'disabled.'"  (Order, AA-007, citing *Conant v. City of Hibbing*, 271 F.3d 782, 785-86.)

Fischer's attempted interpretation of the law contravenes this position: under his argument, every applicant who did not pass a strength and agility test—even a legally permissible test—could still bring a claim that he or she was somehow regarded as impaired under the ADA.  The purpose of the ADAAA is to clarify the ADA in combating "the effects of 'archaic attitudes,' erroneous perceptions, and myths that work to the disadvantage of persons with or regarded as having disabilities." *Wooten v. Farmland Foods*, 58 F.3d 382, 385 (8th Cir. 1995), citing *School Bd. of Nassau County v. Arline*, 480 U.S. 273, 279 & 285 (1987).  The use of objective, carefully designed, data-driven strength and agility assessments to evaluate a person's physical capabilities does not interfere with that objective. Indeed, such assessment is designed to combat erroneous perceptions about what a person can do by conducting actual, objective measurements.

**B.    The erroneous height and weight data entered by the CRT technician does not create a genuine issue of material fact.**

Fischer makes much of the Minnesota Occupational Health technician's apparent errors in entering Fischer's height, weight, and job title.[7]  But Fischer's

---

[7] The Occupational Health technician who conducted Fischer's CRT assessment apparently incorrectly entered Fischer's height as 15 inches, and his weight as 69 pounds, and his job title as Teacher.  (Strombeck Dep. Ex. 14, AA-174.) MPS did not require its teachers to take the CRT assessment.  (*See, e.g.*, Bendel Dep. Ex. 8,

Appellate Case: 14-2245     Page: 37     Date Filed: 08/27/2014 Entry ID: 4190344

argument fails to acknowledge two vital, undisputed points. First, the height and weight data had no bearing on Fischer's assessment results. Second, MPS had no way of knowing his height and weight had been incorrectly entered because the assessment was conducted by an independent entity and the underlying data was never transmitted to MPS.

In fact, Fischer's brief makes a blatant misstatement of fact when it alleges that "Despite **_having knowledge_** of obvious mistakes on the CRT reporting form ("teacher position, height of 15 inches and weight of 69 pounds)…MPS did nothing." (Appellant's Br. at 31, emphasis added.) It is undisputed that MPS did not have such knowledge regarding the height and weight data entry. Moreover, there was nothing to for MPS to do with regard to the supposed height and weight mistakes, because they had nothing to do with Fischer's Body Index Score. And as already established, MPS compared Fischer's Body Index Score to the janitor engineer range (Alfredson Dep. 68:12-14, AA-106), so the job title was irrelevant and did not affect Fischer's results. In fact, had MPS been utilizing a Teacher score range, common sense suggests that the minimum required score would have been lower, and Fischer might have achieved the minimum level necessary.

---

AA-211, noting that the only positions subject to the CRT rankings were "Janitor-Engineer, Equipment Maintenance Engineer, Cook, Food Service Worker/Assistant, Warehouse Specialist, and Special Education Assistant.")

### C. MPS's retesting of special education assistants does not create a genuine issue of material fact.

Fischer claims that MPS offered an "accommodation" of a re-test to other employees, specifically special education assistants. (Appellant's Br. at 31.) Fischer has not established, however, that the re-test was offered as an "accommodation" to any special education assistant. Moreover, special education assistants are not "similarly situated" to janitor engineers because they have different job classifications and different job duties. The "similarly situated" analysis applies if the court is analyzing the "pretext" stage of a disability discrimination claim. At this stage, the plaintiff's evidentiary burden is rigorous; he or she must show that the individuals who were treated differently were similarly situated "in all relevant respects." *Cody v. Prairie Ethanol, LLC*, 2014 WL 3973094 at *5 (8th Cir. Aug. 15, 2014). Fischer has not, and cannot, show that he is "similarly situated in all respects" with any special education assistant, which is an entirely different class of job. *See Young v. Builders Steel Co.*, 754 F.3d 573, 578 (8th Cir. 2014) (holding that "Members of Wage Group 3" were not similarly situated to plaintiff because they "performed different jobs and required different types of certifications and different knowledge to perform those jobs.") *See also Riser v. Target Corp.*, 458 F.3d 817, 822 (8th Cir. 2006) (coworkers with different duties and job positions were not similarly situated). Thus, whether MPS allowed retesting of special education assistants is immaterial to Fischer's claims.

### D. Post-hoc statements by MPS personnel do not mean MPS regarded Fischer as disabled.

Fischer also argues that "the trial court ignored the testimony of MPS decision-makers Alfredson, Bendel, Mason[8] and Strombeck that they regarded Fischer disabled." (Appellant's Br. at 35.) Fischer further contends that MPS' submission to the EEOC, which the court found "not probative," shows that MPS regarded Fischer as disabled. Fischer also takes issue with the District Court's holding that he "adduced no evidence…that any MPS employee attributed his CRT assessment score to any perceived impairment." (Appellant's Br. 36.) Finally, Fischer claims that the District Court "discounted" his testimony that "he did not pass the test because of his back" as "subjective perceptions" and that this constituted an improper evaluation of his credibility. (*Id.*)

In actuality, the District Court evaluated each of the statements alleged in the light most favorable to Fischer and found that they still fell short of creating a genuine issue of material fact. (Order, AA-010.) This was an appropriate determination on a fundamental burden of proof—not a credibility evaluation. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148 (2000) (even if plaintiff can establish weak prima facie case and "set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the

---

[8] Fischer testified that he spoke to Alfredson, Bendel, and Strombeck – not Mason. (*See* Fischer Dep. 73, AA-032.)

Appellate Case: 14-2245    Page: 40    Date Filed: 08/27/2014 Entry ID: 4190344

action was discriminatory.") Moreover, even for summary judgment purposes, the court is not constrained to adopt a version of the facts "blatantly contradicted by the record, so that no reasonable jury could believe it." *Scott v. Harris*, 550 U.S. 372, 380, (2007) (citations omitted), cited in *LaCross v. City of Duluth*, 2012 WL 1694611 (D. Minn. May 14, 2012) *aff'd.,* 713 F.3d 1155 (8th Cir. 2013).

Fischer does not, and cannot, dispute that the only way MPS could have learned about his back score was through Fischer himself, *after* his call with Bret Crosby. Thus, the decision not to recall Fischer had nothing to do with any back score or evaluation of Fischer's back. Even if, as Fischer contends, he was told by any MPS personnel that he was not recalled because of his "back," this does not equate to telling him that they regarded him as impaired. In the absence of admissible evidence sufficient to raise a genuine issue of material fact, Fischer's belief to the contrary does not make it so.

The District Court also properly addressed MPS' Position Statement to the EEOC, holding that it was "not probative of whether MPS regarded Fischer as disabled during the relevant time period." (Order, AA-009 n. 5.) The EEOC position statement was drafted by MPS's counsel well after Fischer's post-CRT discussions with MPS personnel. Fischer does not allege that MPS' legal counsel had any involvement with the decision to implement the CRT, the decision that Fischer did not achieve a "medium-heavy" score on the CRT, or the decision not to

30

recall Fischer. Thus, the EEOC position statement is not, in fact, probative of the mindset of any relevant decisionmaker.

### E. Fischer's expert testimony does not create a genuine issue of material fact.

Curiously, Fischer argues that the testimony of his expert, Dr. Jetzer, establishes that "MPS regarded him as disabled." At the time MPS brought its motion for summary judgment, it also filed a Motion to Exclude Dr. Jetzer's testimony because Dr. Jetzer's opinions lacked proper foundation, were irrelevant, prejudicial and unreliable. The District Court denied MPS' motion as moot when it granted summary judgment. (Order, AA-013.) However, the District Court clearly explained that Dr. Jetzer – who never spoke to anyone at MPS, never saw the applicable CRT machine, and only conducted a physical exam of Fischer in 2013– "has no basis to opine on whether MPS regarded Fischer as disabled in 2011." (*Id.* at AA-008.)

Evidence must be admissible to create a genuine issue of material fact. *Mays v. Rhodes*, 255 F.3d 644, 648 (8th Cir. 2001). The proponent of expert testimony must prove its admissibility by a preponderance of the evidence. *Lauzon v. Senco. Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2003). The court, in carrying out its "gatekeeper" function, has considerable authority and must exclude expert witness testimony that is inherently unreliable. This gatekeeper power is reflected in Rule 702, Fed. R. Evid., which states:

31

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness *qualified as an expert by knowledge, skill, experience, training, or education*, may testify thereto in the form of an opinion or otherwise, if (1) the testimony *is based upon sufficient facts or data*, (2) the testimony *is the product of reliable principles and methods*, and (3) the witness has *applied the principles and methods reliably to the facts*.

Fed. R. Evid. 702 (emphasis added). An expert's testimony must be relevant to evaluating a factual matter in issue to be admissible. *Smith v. BMW N. Am., Inc.*, 308 F.3d 913, 919 (8th Cir. 2002); *see also Clark v. Heidrick*, 150 F.3d 912, 915 (8th Cir. 1998). The testimony must also be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1055 (8th Cir. 2000). "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered" for the opinion to be useful to the jury. *General Elec. Co. v. Joiner*, 522 U.S. 136 (1997).

In his report, Dr. Jetzer purports to offer an opinion about Fischer's physical condition as of December, 2011. (*See* Appellant's Br. at 14-18.) Dr. Jetzer did not treat or evaluate Fischer in 2011, and Fischer's *current* condition says nothing about his condition in 2011—the relevant time period in this case. Moreover, Fischer fails to explain how his actual physical condition is even relevant to a claim that he was only perceived to be disabled. As a result, Dr. Jetzer's report cannot possibly assist the jury and is speculation at its finest. *Cole v. Homier*

32

*Distrib. Co., Inc*., 599 F.3d 856, 867 (8th Cir. 2010) (quoting *Weisgram v. Marley Co*., 528 U.S. 440, 454 (2000) ("Expert testimony that is speculative is not competent proof and contributes 'nothing to a legally sufficient evidentiary basis.'")); *N. Star Mut. Ins. Co. v. Zurich Ins. Co*., 269 F. Supp. 2d 1140, 1146-47 (D. Minn. 2003) (citing *Kemp v. Tyson Seafood Grp., Inc*., 2000 WL 1062105, at *2 (D. Minn., July 19, 2000) ("[T]he Court must, 'before accepting the testimony and opinion of an expert witness, determin[e] whether the opinion is based upon sound, reliable theory, or whether it constitutes rank speculation.'")).

It is axiomatic that "experts may not invade the court's province by testifying on issues of law." *Buffalo Wild Wings, Inc. v. Buffalo Wings & Rings*, 2011 WL 4537970, at *6 (D. Minn. Sept. 29, 2011) (quoting *Holman Enters. v. Fid. and Guar. Ins. Co.*, 563 F.Supp.2d 467, 472 (D.N.J. 2008) (internal quotation marks omitted)). *See Peterson v. City of Plymouth,* 60 F.3d 469, 475 (8th Cir. 1995) (expert testimony on reasonableness of police behavior in light of Fourth Amendment standards is a statement of legal conclusions and therefore inadmissible). Therefore, expert opinions on the law are generally inadmissible. *S. Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc.*, 320 F.3d 838, 841 (8th Cir. 2003); *see also In re Initial Pub. Offering Sec. Litig.*, 174 F. Supp. 2d 61, 64 (S.D.N.Y. 2001) ("The rule prohibiting experts from providing their legal

Appellate Case: 14-2245    Page: 44    Date Filed: 08/27/2014 Entry ID: 4190344

opinions or conclusions is so well-established that it is often deemed a basic premise or assumption of evidence law – a kind of axiomatic principle.")

Dr. Jetzer's statement that MPS regarded Fischer as substantially impaired and a threat to safety is nothing more than a legal conclusion masquerading as expert opinion. (Appellant's Br. at 15.) Fischer's submission of these conclusions is a prejudicial and impermissible attempt to use an "expert" to invade the court's province on legal conclusions. Moreover, Dr. Jetzer has no foundation upon which to opine upon the District's understandings or motivations.

In short, Dr. Jetzer's proposed testimony is inadmissible, without foundation, purports to tell the court how to rule on legal matters, and cannot establish a genuine issue of material fact to defeat MPS' motion for summary judgment.

## II. FISCHER WAS NOT ENTITLED TO AN ACCOMMODATION, NOR DID HE REQUEST ONE.

### A. Fischer was not entitled to an accommodation because he asserts only a "regarded as" disability claim.

In an argument pulled directly from his brief opposing summary judgment, Fischer makes the startling claim that "[b]y utilizing a medical examination to disqualify Fischer post-offer, MPS had an obligation to engage in an interactive process with him." Fischer also states that "[t]he failure to enter into the interactive process is prima facie evidence of bad faith." (Appellant's Br. at 31.)

34

The District Court briefly addressed this claim in a footnote, holding that "[t]o the extent that Fischer alleges claims for failure to accommodate and for failure to engage in an interactive process, such arguments also fail." (AA-010 n. 6.) Fischer offers no reason why the court's analysis is incorrect; instead, he merely repeats his earlier arguments nearly verbatim.

Fischer is trying to apply a failure-to-accommodate analysis to a case where there is no obligation to accommodate. Moreover, a failure to enter into the interactive process does not automatically entitle a plaintiff to cry "bad faith." *See Fjellestad v. Pizza Hut of Am., Inc.,* 188 F.3d 944, 952 (8th Cir. 1999) (citations omitted) (holding that "[w]e tend to agree with those courts that hold that there is no per se liability under the ADA if an employer fails to engage in an interactive process."); *accord*, *Gregor v. Polar Semiconductor, Inc*., 2013 WL 588743 at *5 (D. Minn. Feb. 13, 2013) (employer not liable "for failing to engage in an interactive process if no reasonable accommodation was possible.") Such an analysis holds even more strongly where, as here, Fischer was never entitled to an accommodation, nor did he request one.

The EEOC, in its "Interpretive Guidance on Title I of the Americans with Disabilities Act," effective January 29, 2014, is also at odds with Fischer's argument:

> A covered entity is required, absent undue hardship, to provide reasonable accommodation to an otherwise qualified individual with a

Appellate Case: 14-2245    Page: 46    Date Filed: 08/27/2014 Entry ID: 4190344

substantially limiting impairment or a "record of" such an impairment. ***However, a covered entity is not required to provide an accommodation to an individual who meets the definition of disability solely under the "regarded as" prong.***

29 C.F.R. § 1630(o) Reasonable Accommodation (emphasis added). This comports with Eighth Circuit precedent: the interactive process is triggered "***if*** the employee needs an accommodation." *Kratzer v. Rockwell Collins, Inc.*, 398 F.3d 1040, 1045 (8th Cir. 2005) (emphasis added). *See also Weber v. Strippit, Inc.*, 186 F.3d 907, 917 (8th Cir. 1999) (ADA); *McLain v. Andersen Windows, Inc.*, 2007 WL 710173 at *4 (D. Minn. Mar. 6, 2007) (logic of *Weber* likely also applies to MHRA failure-to-accommodate claim). The Eastern District of Missouri, interpreting Eighth Circuit law, agrees: "because Defendant was not required to make reasonable accommodations for Plaintiff's perceived disability, it was not required to engage in the interactive process of determining such an accommodation either." *Bishop v. Nu-Way Serv. Stations, Inc*., 340 F. Supp. 2d 1008, 1014 n.5 (E.D. Mo. 2004).

The cases cited by Fischer regarding the interactive process remain as inapposite as they did when cited in his summary judgment briefing. Those cases involved plaintiffs with actual disabilities, not "perceived as" or "regarded as" disabilities. *Eldredge* involved a firefighter with macular degeneration and progressive loss of vision. *Eldredge v. City of St. Paul*, 809 F. Supp. 2d 1011, 1020 (D. Minn. 2011). *Edstrom* involved a job candidate with a severe hearing impairment. *Edstrom v. Hibbing Taconite Co*., 720 F.Supp.2d 1073 (D. Minn.

36

2010). *Heise* involved a salesperson with debilitating headaches related to a skull malformation, whom the employer acknowledged was disabled. *Heise v. Genuine Parts Co.*, 900 F.Supp. 1137 (D. Minn. 1995). *Garcia-Ayala* involved a plaintiff treating for breast cancer. *Garcia-Ayala v. Lederle Parenterals, Inc.*, 212 F.3d 638 (1st Cir. 2000). Unlike these cases, Fischer is alleging only a perceived disability, for which, as a matter of law, there is no duty to accommodate.

### B. Fischer never requested an accommodation, so the "interactive process" was never triggered.

Fischer suffers from no actual disability, and he has never claimed to be disabled. He has not provided evidence to create an issue of material fact that he ever tied any discussions with MPS personal to a disability or request for "accommodation."

> To establish that an employer failed to participate in an interactive process, a disabled employee must show: (1) the employer knew about the employee's disability; (2) the employee requested accommodation or assistance for his or her disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodation; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith."

*Cravens v. Blue Cross & Blue Shield of Kansas City*, 214 F.3d 1011, 1021 (8th Cir. 2000). An employer's obligation to engage in the interactive process is not "triggered" unless the "employer knows of an employee's disability" and "the employee or the employee's representative has requested accommodation."

Appellate Case: 14-2245    Page: 48    Date Filed: 08/27/2014 Entry ID: 4190344

*Fjellestad v. Pizza Hut of Am., Inc.*, 188 F.3d 944, 952 (8th Cir. 1999) (citations omitted).

Moreover, an employer is not required to infer the existence of such a request where the record establishes the plaintiff did not make one. *See, e.g. Beveridge v. Nw. Airlines, Inc.*, 259 F. Supp. 2d 838, 852-53 (D. Minn. 2003):

> Further, we reject the Plaintiff's contention, that his application for the CSS position—which, admittedly, he believed he could perform without any accommodation—was sufficient to inform the Defendant that the Plaintiff was seeking an accommodation. Nowhere in that application, or in the application process, did the Plaintiff ever suggest that he needed an accommodation to perform the duties of the CSS position. ... Had the Plaintiff done so, then a different Record would be presented, but having failed to demonstrate, that a request for accommodation was made by him, we reject his implicit notion that the Defendant should be expected to "mind read" his unexpressed interest in obtaining an accommodation. *See*, *Mole v. Buckhorn Rubber Products, Inc.,* supra at 1217.

*Id.* (other internal citation omitted). *See also E.E.O.C. v. Prod. Fabricators, Inc.*, 2014 WL 3971477 at *5 (8th Cir. Aug. 15, 2014), citing *Kratzer v. Rockwell Collins, Inc.*, 398 F.3d 1040, 1045 (8th Cir. 2005) ("While the interactive process is 'informal and flexible,' the 'predicate requirement triggering the interactive process is the employee's request for the accommodation.'"). Here, because Fischer is only alleging that he was "perceived as" disabled, and did not tie his complaints to any actual disability, the interactive process was not triggered. Nor was MPS obligated to "mind read" or assist him in seeking an accommodation, because, as discussed above, he was not entitled to an accommodation. As a result,

38

the District Court correctly dismissed these claims to the extent they were even properly pled.  (Order, AA-010 n. 6.)

## III.  FISCHER'S UNPLED CLAIMS WERE PROPERLY DISREGARDED BY THE DISTRICT COURT.

In opposition to MPS' summary judgment motion, Fischer alleged for the first time new legal claims related to the use of the CRT assessment: first, that "MPS Made Inappropriate Medical Inquiries" (Appellant's Br. at 26); and second, that "MPS Performed a Medical Examination;" (*Id.* at 27).  These two unpled claims are based on testimony that the independent third-party vendor, Minnesota Occupational Health, had Fischer complete a one-page questionnaire about his past health, and took his pulse and blood pressure prior to the CRT test.  (*Id.* at 28.)

The District Court addressed these claims in a footnote to its Order:

> [t]o the extent that Fischer alleges that requiring the assessment was a per se violation of the ADA and the MHRA, such claims were not pleaded and are not properly before the court." *See Cossette v. Minn. Power & Light*, 188 F.3d 964, 968 (8th Cir. 1999).

(Order, AA-0003 n.1.)  Fischer provides no caselaw to challenge the District Court's holding; instead, he merely repeats his prior summary judgment opposition brief, essentially verbatim.  For this reason alone, the Court should affirm the District Court's holding.

It is undisputed that any health data collected by Minnesota Occupational Health was not incorporated into the Body Index Score transmitted to MPS

39

because the CRT assessment does not require the collection of medical data. (*See* CRT Legal Fact Sheet, Strombeck Dep. Ex. 16, AA-176 to AA-177.) Such information was collected independently by the vendor (not MPS) for purposes of "CRT Testing Clearance." (*See* Fischer Dep. Ex. 8, AA-049.) Any physiological data obtained was only to make sure that it was safe for Fischer to undergo the CRT, was not part of the Body Index Score, was never transmitted to MPS, and was never used by MPS, which received only the Body Index Score. (Alfredson Dep. 41:24-42:6, AA-100.)

### A. Fischer's unpled claims were properly dismissed.

The District Court correctly declined to address Fischer's attempt to bring in new, unpled claims under the guise of opposing summary judgment. Fischer never amended his original Complaint, so his effort to bring in such claims constituted an attempted end-run around the Court's scheduling order.

Additionally, Fischer's unpled claims could have been dismissed as time-barred under the MHRA and ADA, given that they were neither pled in his complaint nor included in his Charge of Discrimination.[9]

---

[9] MHRA claims are time-barred if not brought within one year of the discriminatory practice. Minn. Stat. § 363A.28, Subd. 3.; ADA and Title VII claims are time-barred if a charge is not filed "within one hundred and eighty days after the alleged unlawful employment practice" or within 300 days if a charge is filed. 42 U.S.C. § 2000-e 5(1).

Appellate Case: 14-2245    Page: 51    Date Filed: 08/27/2014 Entry ID: 4190344

Fischer's unpled claims could also have been dismissed for failure to exhaust administrative remedies. Where an employee files a charge of discrimination, the substance of the original charge must be sufficient to put the employer on notice of any additional bases of discrimination the employee might attempt to assert in a later lawsuit, or the employee has not exhausted administrative remedies with regard to the additional bases. *Henke v. Allina Health Sys.*, 698 F. Supp. 2d 1115, 1124 (D. Minn. 2010), citing *Nichols v. Am. Nat. Ins. Co.*, 154 F.3d 875, 886 (8th Cir. 1998). Fischer's Charge of Discrimination alleged only discrimination based on a "perceived disability," not improper medical inquiry or examination. As a result, Fischer's attempt to re-bring those claims in his appeal brief remains improper, and the District Court was correct in disregarding them.

## B. Fischer's unpled claims also fail as a matter of law.

Not only are Fischer's unpled claims technically improper, they remain insufficient on the merits. Fischer first argues that the CRT assessment should be evaluated as a pre-offer medical inquiry—even though there is no dispute that it was administered to Fischer post-offer—simply because Cost Reduction Technologies' materials suggest that it could be used pre-offer and it was incorrectly referred to as such in MPS's Position Statement to the EEOC. (Appellant's Br. at 26.) Fischer then reverses course to argue that the CRT

41

assessment was simultaneously a post-offer "medical examination" of Mr. Fischer. (*Id.* at 27-28.)  In addition to being procedurally improper, both claims fail on the merits for the reasons discussed below.

1.     *The CRT was not a pre-offer medical inquiry.*

The timing of Fischer's offer and CRT assessment are not in dispute.  There is no question that the CRT assessment was to Fischer administered post-offer. This comports with the testimony of Lisa Strombeck that the CRT was intended to be a "post-hire preplacement" assessment.  (Strombeck Dep. 37:19-38:2, AA-135.)

Fischer attempts to sidestep the facts by stating that Human Resources Consultant Mary Alfredson testified the CRT was done "pre-offer"[10] and MPS later issued a Position Statement to the EEOC which inaccurately referred to "pre-offer" tests.  (Appellant's Br. at 26, citing Alfredson Dep. p. 49, Ex. 7, pp. 3-4.)  A review of the facts stated in the Position Statement, however, supports the position that the CRT assessment was given post-offer:

> Mr. Fischer, recalled Dec. 08, 2011 in seniority order, for a vacant janitor engineer position, was told that he must have a valid boilers license as well as complete a Cost Reduction Technology assessment (CRT test)….Mr. Fischer on Dec. 12, 2011 took the CRT test.  He received a BIS of 197.5 and did not meet the threshold.  He did not pass.

(Alfredson Dep. Ex. 7, AA-121-AA-125.)

---

[10] Ms. Alfredson later accurately testified that Mr. Fischer took the CRT assessment *after* his offer letter was sent out.  (Alfredson Dep. 65:16-21, AA-106.)

Appellate Case: 14-2245      Page: 53      Date Filed: 08/27/2014 Entry ID: 4190344

But neither Alfredson's testimony nor the Position Statement changes the undisputed fact that Fischer received an unambiguous offer of employment (the recall letter) that made his return to work contingent on his passing the CRT assessment, meaning that the CRT was administered post offer.

2. *The data from the Minnesota Occupational Health questionnaire was not collected or used by MPS.*

Fischer also claims that the questionnaire administered by Minnesota Occupational Health prior to the CRT assessment meant that **MPS** somehow conducted an improper medical examination on Fischer. It is undisputed that Fischer completed the CRT assessment at the facility provided by the independent vendor, Minnesota Occupational Health, not a party to this litigation. As is evident from the questionnaire itself, which is called a "CRT Testing Clearance" and referring only to "Minnesota Occupational Health" (*see* Fischer Dep. Ex. 8, AA-049), the information requested was intended for use only by Minnesota Occupational Health, merely to clear Fischer to determine if it was safe for him to take the CRT.

MPS was aware only that Minnesota Occupational Health was using a "questionnaire." (Strombeck Dep. 67:6-15, AA-142.) The only data relied on by MPS was the Body Index Score, which did not disclose any of Fischer's health-related data, his blood pressure or pulse rate. (*See* Fischer Dep. Ex. 9, AA-050.) Hence, there was no "medical examination" conducted by MPS. Even if—for

43

purposes of summary judgment analysis only—the assessment constituted a post-offer medical examination, the examination was not performed by MPS, was not used by MPS in making its decision, does not screen for disability, and was job-related and consistent with business necessity, as discussed further below.

### 3. *The assessment was legitimate, lawful, job-related, and consistent with business necessity.*

Finally, although MPS does not concede that the CRT assessment constituted a post-offer medical examination, such examinations are nevertheless legitimate, provided they are used correctly.

> In the post-offer but pre-employment stage, the employer may require a medical examination and may condition an offer of employment on the results of the examination if all ***entering*** employees are subject to the examination, the results are stored confidentially, and the results of the examination are used only in accordance with the Act.

*Brady v. Potter*, 2004 WL 964264 (D. Minn. Apr. 30, 2004), (emphasis added), citing 42 U.S.C. § 12112(d)(3)(A)-(C); *see also* § 1630.14(b), which provides in part:

> A covered entity may require a medical examination (and/or inquiry) after making an offer of employment to a job applicant and before the applicant begins his or her employment duties, and may condition an offer of employment on the results of such examination (and/or inquiry), if all entering employees in the same job category are subjected to such an examination (and/or inquiry) regardless of disability.

44

Similarly, the Minnesota Human Rights Act allows post-offer physical examinations "for the purpose of determining the person's capability to perform available employment." Applicable statutory requirements for examinations are

> (i)    that an offer of employment has been made on condition that the person meets the physical or mental requirements of the job, except that a law enforcement agency filling a peace officer position or part-time peace officer position may require or request an applicant to undergo psychological evaluation before a job offer is made provided that the psychological evaluation is for those job-related abilities set forth by the Board of Peace Officer Standards and Training for psychological evaluations and is otherwise lawful;
>
> (ii)   that the examination tests only for essential job-related abilities;
>
> (iii)  that the examination except for examinations authorized under chapter 176 is required of all persons conditionally offered employment for the same position regardless of disability…

Minn. Stat. § 363A.20, Subd. 8(a)(1); *See also Huisenga v. Opus Corp.*, 494 N.W.2d 469, 472 (Minn. 1992) (citing an earlier version of the statute).

Under the ADA, while the examination itself does not have to be "job related and consistent with business necessity," any "exclusionary criteria must be job-related and consistent with business necessity, and performance of the essential job functions cannot be accomplished with reasonable accommodation as required in this part." 29 C.F.R. § 1630.14(b)(3).[11] This Court has held that for a physically

---

[11] Fischer also cites this regulation for the proposition that MPS should have engaged in the interactive process to find an accommodation for Fischer. As discussed elsewhere in this brief, Fischer is not actually disabled, and so never asked for an accommodation. In any event, as a matter of law, he is not entitled to an accommodation.

Appellate Case: 14-2245     Page: 56     Date Filed: 08/27/2014 Entry ID: 4190344

rigorous job, a post-offer medical examination conducted to assess "a prospective employee's ability to safely perform the physical demands of a specific job" is sufficiently job-related and consistent with business necessity to warrant summary judgment for the employer. *Conant v. City of Hibbing*, 131 F. Supp. 2d 1129, 1137 n.5 (D. Minn. 2000) *aff'd*., 271 F.3d 782 (8th Cir. 2001).

Every entering janitor engineer candidate recalled from layoff or hired by MPS following implementation of the CRT assessment in August of 2011 has been required to achieve a passing score without re-test. (Bendel Aff. at ¶ 2, MPS App. 11.) Fischer attempts to obscure this fact by stating that not all janitor engineers took the CRT. (Appellant's Br. at 7.) But, as Mary Alfredson testified, the CRT only became "part of the qualifications" for the janitor engineer position as of the date it was implemented. (Alfredson Dep. 34:12-13, AA-098.) Any janitor engineer who did not take the CRT was recalled by seniority *before* the assessment was implemented (Bendel Dep. 71:9-19, AA-204) and was thus not similarly situated to Fischer.

The CRT assessment and its criteria were job-related and consistent with the business necessity for safe performance of the physical demands of the janitor engineer position. The assessment was based on a careful analysis of actual MPS janitor engineers demonstrating actual tasks. The CRT assessment does not screen for disability, because it is designed to test an individual's strength output, not

46

"impairment." Thus, Fischer's arguments, even they had been properly before the district court, would not have survived summary judgment.

> 4. *MPS does not need to show that Fischer was a direct threat to himself or others.*

Fischer's brief also repeats, almost word-for-word his previous "straw man" argument regarding the direct threat defense. But MPS did not assert a "direct threat" defense to this lawsuit, nor did the District Court rely on such a defense. (*See generally* Order.)

Fischer claims that MPS considered him impaired in his ability to work because "MPS considered Mr. Fischer unable to safely lift, push, or pull over 50 pounds in any job without creating of risk of injury to himself or other injuries around him." (Appellant's Br. at 24.) In support of this argument, Fischer cites to MPS's Position Statement to the EEOC (the "Position Statement"), which was submitted by District General Counsel well after the events giving rise to Fischer's Complaint. Fischer also cites to the testimony of Mary Alfredson, the Human Resources Consultant who received Fischer's Body Index Score and compared it to the acceptable range for the medium-heavy position. (*Id.*) As he did at the District Court level, Fischer mischaracterizes both the Position Statement and Alfredson's testimony, which do not establish that MPS regarded him as impaired in his ability to work at the time Fischer was passed over for recall.

47

Although Alfredson—who was the person who determined that Fischer's Body Index Score did not meet the "medium-heavy" level"—was asked about the Position Statement, she was not the drafter of the document, nor did she have any input into it.  (Alfredson Dep. 66:23-67:3, AA-106.)  Moreover, Alfredson actually testified that at the time she compared Fischer's Body Index Score to the acceptable ranges, she did *not* have the understanding that Fischer presented a risk.

> Q.     …In the middle of the first main paragraph it says, "Mr. Fischer's BIS," which I understand to be that score the 197.5, "indicates his job performance would potentially endanger not only other employees but himself when being required to pull or carry or push," et cetera.  Do you see that?
>
> A.     I do.
>
> Q.     Did you have that understanding?
>
> A.     ***No***.

(*Id.* at 61:9-19, AA-105 (emphasis added).)  Alfredson went on to testify, not that Fischer was impaired or that he could not work, but that, based solely on her review of the Body Index Score and the range chart (which was never explained to her), that a score of 197.5 disqualified Fischer from the janitor engineer position due to the physical rigors of working with a "heavy load"):

> Q.     Did you have the understanding, at least from your position as a recruiter, that having that score of 197.5 made him incapable of pulling, carrying, pushing or lifting a heavy load?
>
> A.     Yes.
>
> Q.     And how did you come by that understanding?

48

A.     Based on the ranges that we were given for the position.

(*Id.* at 62:2-10, AA-105; *Id.* at 68:6-10, AA-106.)   This does not constitute "impairment" establishing a "perceived" disability under either the ADA or the MHRA.

Similarly, MPS' position statement to the EEOC, which was drafted by a non-decisionmaker after the fact, and which included a number of potential defenses, does not mean that the individuals who made the decisions regarding Mr. Fischer perceived him as impaired in any way.  Fischer has not established that MPS perceived him as disabled, and the District Court did not need to consider a "direct threat" defense in order to properly dismiss Fischer's claims.

## IV.   MPS DID NOT COMMIT REPRISAL UNDER THE MINNESOTA HUMAN RIGHTS ACT.

Although Fischer cites to the ADA in his appeal brief, Fischer's reprisal claim was asserted under only the Minnesota Human Rights Act, not federal law. (Compl. at pp. 4-5.)   Like much of Fischer's brief, his argument regarding his reprisal claim simply duplicates his prior arguments verbatim, and does not present new arguments or law to overcome the District Court's decision.   The District Court correctly noted that Fischer's request for a re-test, even if protected conduct, occurred after "the determination not to recall Fischer had already been made." (Order, AA-011.)   Fischer's complaint to the union and EEOC charge also occurred well after that date, meaning that there was not a causal connection

49

between Fischer's conduct and any adverse action taken against him. Thus, Fischer fails to establish a prima facie case of retaliation. (*Id.* at AA-012.)

Moreover, at the time Fischer asked to re-take the test, he did not tie his request to any disability. Indeed, Fischer suffers from no actual disability. "Standing alone, a request for assistance…may not constitute protected activity." *Hoover v. Norwest Private Mortgage Banking*, 632 N.W.2d 534, 548 (Minn. 2001). Thus, his request to re-take the test could not have been protected activity.

Fischer's alleged statements that "I was able to do the job" and "all knew that I had worked in the position before without any problems" do not rise to the level of "protected activity," either. To be "statutorily protected," a plaintiff must "oppose a practice forbidden" under the MHRA. Minn. Stat. § 363A.15. Standing alone, ordinary "complaints do not constitute protected activity for purposes of a retaliation (or reprisal) claim unless they implicate race or some other illegitimate criterion." *See, e.g., Hunt v. Neb. Pub. Power Dist.*, 282 F.3d 1021, 1028-29 (8th Cir. 2002) (plaintiff's complaints not protected activity where she "did not attribute [the defendant's] failure to give her a raise or a promotion to sex discrimination.") Fischer's statements that he was able to do the job do not implicate any "illegitimate criterion." Whether he had worked in the position before with no problems was immaterial to MPS' decision; among other issues, he had been laid off for nearly a year and a half at the time of the recall notice. Prior to layoff, he

50

had worked for MPS for only two years plus approximately three months. After all, the school district had no way of knowing whether he had suffered an injury or other problem in the intervening period. As a matter of law, Fischer's post-employment "complaints" do not constitute protected activity and MPS did not commit reprisal.

Moreover, Fischer was not an employee at the time of the alleged adverse action. Reprisal cannot occur after the employee is no longer employed, unless the reprisal involves some communication with the employee's new employer. *Am. Bldg. Contractors, Inc. v. Asset Restoration & Remodeling, LLC*, 2009 WL 3736022 (Minn. Ct. App. Nov. 10, 2009), citing Minn. Stat. § 363A.15, "defining reprisal to include employer conduct toward an employee during period of employment…") MPS could not have engaged in reprisal *after* its decision not to return Fischer to a janitor engineer position.

Moreover, even if Fischer had established a prima facie case (which the District Court held he did not), his argument fails because he cannot establish pretext on the part of MPS. MPS has articulated a legitimate reason why Fischer was not hired: he didn't achieve a medium-heavy score. The assessment has been performed on every janitor engineer recalled after August, 2011, along with every new hire after that date. The assessment was based on an in-depth analysis of the physical demands of the position. Fischer identifies no janitor engineer candidate

Appellate Case: 14-2245    Page: 62    Date Filed: 08/27/2014 Entry ID: 4190344

who has been allowed to work as a janitor engineer after not achieving a medium-heavy level score, and no janitor engineer candidate who was allowed to re-test, because there are none. In other words, Fischer was not treated any differently than any other janitor engineer candidate following implementation of the CRT assessment. Treating him the same as everyone else cannot be reprisal.

## V. ALTERNATIVELY, FISCHER'S STATE LAW CLAIMS ARE BARRED BY OFFICIAL IMMUNITY.

Even if Fischer could establish discrimination or reprisal (which he cannot), MPS is entitled to official immunity from his MHRA claims. Official immunity protects government officials from suit for discretionary actions taken in the course of their official duties. *Kari v. City of Maplewood*, 582 N.W.2d 921, 923 (Minn. 1998); *Pletan v. Gaines*, 494 N.W.2d 38, 40 (Minn. 1992). The definition of discretion refers to "professional judgment" that is "exercised on an operational level." *Schaffer v. Ramsey County*, 2002 WL 1423114 (Minn. Ct. App. July 2, 2002). Vicarious official immunity protects a governmental entity from liability based on the acts of an employee that is entitled to official immunity. *Wiederholt v. City of Minneapolis*, 581 N.W.2d 312, 316 (Minn. 1998).

To defeat an official-immunity defense, a plaintiff must show that the defendant committed a willful or malicious wrong. *Rico v. State*, 472 N.W.2d 100, 106-07 (Minn. 1991). To establish that an official's conduct is malicious or willful, the plaintiff must present specific facts that the official intentionally

52

committed wrongful acts without legal justification or willfully violated a known right. *Id.* "Malice means more than that the [defendant] intentionally did an act which is later determined to be wrong; rather, the [defendant] must have reason to know his act is prohibited." *Greiner v. City of Champlin*, 27 F.3d 1346, 1355 (8th Cir. 1994). This is a subjective standard, in contrast to the objective qualified immunity standard under federal law. *Nelson v. County of Wright*, 162 F.3d 986, 991 (8th Cir. 1998).

In his Memorandum of Law opposing summary judgment, Fischer argued that MPS' official immunity defense was time-barred because it was brought after the deadline to amend pleadings. [ECF Doc. 34 at 26-27]. Fischer's argument fails because what was actually time-barred were "motions which seek to amend the pleadings to add *claims* or to add *parties*." (Pretrial Scheduling Order, [ECF Doc. 8] (emphasis provided).) MPS did not add either a party or a claim—just a defense. And "an affirmative defense is not a claim for relief." *Wells Fargo & Co. v. United States*, 750 F. Supp. 2d 1049, 1051 (D. Minn. 2010), citing *Ashcroft v. Iqbal,* 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). Thus, MPS' defense is not time-barred.

Further, based on the definition of "official immunity," MPS could have asserted the defense on language already expressly pled in its initial Answer:

> Plaintiff's claims are barred because Defendant's actions at all times with respect to Plaintiff were reasonable and done in good faith, were

53

based upon a proper purpose and legitimate, non-discriminatory reasons, and were in compliance with all applicable provisions of the law.

(Answer § 32 [ECF Doc. 4].) Finally, given that at the time of the amendment, the discovery period was still open and Fischer had yet to depose any of MPS's personnel, Fischer simply cannot establish any prejudice stemming from the amendment. The defense is not time-barred.

There is no dispute that the implementation of the CRT test was a discretionary act. As such, MPS is immune from claims that the CRT violates the Minnesota Human Rights Act. Fischer has not produced any evidence that any MPS employees intended or thought they were violating Fischer's rights. Indeed, MPS applied the same test to all janitor engineers after August, 2011, in an effort to increase safety. On the basis of this record, MPS is shielded from any potential liability because its officials could not be liable. *See, e.g., Kari v. City of Maplewood*, 582 N.W.2d 921 (Minn. 1998).

Appellate Case: 14-2245    Page: 65    Date Filed: 08/27/2014 Entry ID: 4190344

**BASSFORD REMELE**
*A Professional Association*

Dated:  August 27, 2014

*s/ Jonathan P. Norrie*
Jonathan P. Norrie (License #347309)
Alan I. Silver (License #101023)
Kerri J. Nelson (Minnesota #386920)
*Attorneys for Appellee Minneapolis Public Schools*
33 South Sixth Street, Suite 3800
Minneapolis, Minnesota 55402-3707
Telephone:   (612) 333-3000
Facsimile:    (612) 333-8829

55

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitations of Fed. R. App. P. 23(a)(7)(B)(i) because it contains 12,988 words, excluding the parts of the brief excepted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word 2010 in Times New Roman font style in size 14.

Dated:  August 27, 2014        *s/ Jonathan P. Norrie*
                                          Jonathan P. Norrie

Appellate Case: 14-2245     Page: 67     Date Filed: 08/27/2014 Entry ID: 4190344

## <u>CERTIFICATE OF VIRUS FREE</u>

Pursuant to Rule 28A(h)(2) of the Eighth Circuit Rules of Appellate Procedure, the undersigned counsel for Minneapolis Public Schools certifies that the attached Appellee's Brief has been scanned for computer viruses and is virus-free.


Dated: August 27, 2014          *s/ Jonathan P. Norrie*

                                Jonathan P. Norrie

Appellate Case: 14-2245    Page: 68    Date Filed: 08/27/2014 Entry ID: 4190344

**Type Case Name**
**No. 14-2245**

## <u>CERTIFICATE OF SERVICE</u>
## <u>FOR DOCUMENTS FILED USING CM/ECF</u>

I hereby certify that on August 27, 2014, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.


Dated: August 27, 2014          *s/ Jonathan P. Norrie*
                                Jonathan P. Norrie

58